## SMITHSONIAN INSTITUTION *v.* MEECH.

### APPEAL FROM THE COURT OF APPEALS OF THE DISTRICT OF COLUMBIA.

No. 191. Argued January 12, 1898. — Decided February 28, 1898.

In the District of Columbia it is the rule that when, upon a purchase of real estate the conveyance of the legal title is to one person while the consideration is paid by another, an implied or resulting trust arises, which may be shown by parol proof; and the grantee in the conveyance will be held, on such evidence, as trustee for the party from whom the consideration proceeds, whose rights will be enforced as against those claiming under the record title.

This case comes within that rule, the evidence being clear and satisfactory that the oral agreement made between Mr. and Mrs. Avery, at the time when the property was conveyed to the latter, was made as asserted by the Smithsonian Institution.

Such being established as the fact, it is the duty of a court of equity to recognize that agreement as against the legal effect of the conveyance to Mrs. Avery.

The presumption that when the consideration for a deed is paid by a husband, and the conveyance is made to his wife, the conveyance is intended for her benefit, is one of fact which can be overthrown by proof of the real intent of the parties.

When a testator declares in his will that his several bequests are made upon the condition that the legatees acquiesce in the provisions of his will, no legatee can, without compliance with that condition, receive his bounty, or be put in a position to use it in an effort to thwart his expressed purposes.

On June 4, 1895, the appellant, as plaintiff, filed its bill in the Supreme Court of the District of Columbia to enforce certain rights claimed under a will made by Robert S. Avery, on July 22, 1893. In this will, after sundry bequests to his own relatives, is the following:

"I bequeath to the sister and brothers of my late wife one thousand dollars (1000) to be equally divided between them. I have already given these last over a thousand dollars which my wife inherited from her father, also clothing and other gifts; thus equalizing substantially my gifts to her family and to mine. These bequests are all made upon the condition that the legatees acquiesce in this will and I hereby bequeath the share or shares of any disputing this will to the residuary legatee hereinafter named.

"All the rest and residue of my estate, of whatsoever nature, real, personal or mixed and wheresoever situate, I hereby give, devise and bequeath unto the Smithsonian Institute, a body corporate by virtue of the laws of the United States, of which institution Samuel P. Langley is now secretary, having its legal residence in the District of Columbia, unto it and its successors forever.

"Having always had a love for the sciences, and having acquired most of my property while toiling in humble capacities to extend and diffuse knowledge, I have concluded that

the residuary gift above made to the Smithsonian Institution will best express my interest in science. As my labors have been directed to the invention and use of phonetic type, I desire, but do not require, that the income derived by the Smithsonian Institution from this gift may be applied, so far as it may determine, to promoting publications in such type of scientific publication, especially of such publications as may relate to phonetic type and printing. I also desire, but by no means require, that such part of said income as the said institution shall determine shall be applied to the publication of lectures and treatises upon and concerning those mechanical laws governing an ethereal medium which are treated of in atomic chemistry, and which are supposed to govern phenomena of electricity, magnetism, light and heat. Prizes might be given for essays on these subjects and upon such other kindred subjects as may meet the approval of the institution. I would like, however, to have published first the multiplying table and also IV-plate logarithms, publication of the table of squares, cubes, square roots, cube roots, reciprocals, prime numbers and factors, some of which I have written out. If the institution shall approve, the fund derived from the residuary bequest shall be called 'the Avery fund' or 'the fund contributed by Robert S. Avery and his wife Lydia T. Avery, for the extension of the sciences,' and all publications made from the fund shall bear this inscription.

"The property known as part of lot 2 (two) in square 787 in the city of Washington, D.C., being premises No. 326 A street S.E., is my property, although the title stands in my wife's name. I include it in the residuary bequest to the Smithsonian Institution."

The testator died childless on September 12, 1894. The will was probated February 2, 1895. He and his wife had lived for many years in Washington, he being in the employ of the Government in the Coast Survey Office. During these years he lived a quiet and retired life, devoting himself to scientific research, and experimenting chiefly in the matter of phonetic type. His wife was younger than he, and was, until shortly before her death, on November 18, 1890, in apparently

good health. While they were both living, and on April 20, 1885, the real estate described in the last paragraph quoted from the will was purchased, the title being conveyed to Mrs. Avery.

The bill alleged that the lot was paid for with the money of Robert Avery ; that the title was taken in the name of Mrs. Avery because it was supposed that she would outlive her husband and upon an understanding and agreement that the property should, after their deaths, pass to the Smithsonian Institution in pursuance of a mutual desire to make their gift to this institution as large as possible ; that notwithstanding these facts the defendants, other than the executrix, claimed title to the property as the heirs of Mrs. Avery, and had demanded possession. The prayer was for a finding and decree that the equitable title was in Robert Avery, and passed to the plaintiff by his last will ; that the defendants be enjoined from claiming any title thereto, and that the executrix be directed to treat the thousand dollars bequeathed to the sister and brothers as forfeited for breach of condition annexed to said legacy, and as having fallen into the residuum. After answer, testimony was taken and the case was heard before Justice Hagner of the Supreme Court, who rendered a decree in accordance with the prayer of the bill, so far as respects the lot, but denying the relief sought as to the legacy on condition of the defendants executing a release of all claims to the realty. On appeal by all of the defendants, except the executrix, the Court of Appeals reversed the decree of the Supreme Court and remanded the case with directions to dismiss the bill. 8 App. D. C. 490. Whereupon the plaintiff appealed to this court.

*Mr. Frank W. Hackett* for appellant.

*Mr. Franklin H. Mackey* for appellees.

Mr. Justice Brewer, after stating the case, delivered the opinion of the court.

The legal title to this property passed by the conveyance

in 1885 to Mrs. Avery.    She died without will.    *Prima
facie*, therefore, the title then passed to her heirs, the ap-
pellees.    The plaintiff insists that in fact the purchase price
was paid by Mr. Avery and paid under an oral agreement,
whereby a resulting trust was created which changed the
course of the title, and the first questions are, whose money
paid for the lot, and was there such an agreement, and, if so,
what were its terms ?

That the money which was used in making payment for
the lot was the money of Mr. Avery, is not seriously ques-
tioned.    Both Mr. and Mrs. Avery lived very economically,
and this money was accumulated out of savings from the
salary he received from the Government.    At the time of
their marriage Mrs. Avery had a small amount of money on
deposit in a savings bank in Connecticut, and the books of
the bank showed that no part of that amount was drawn out
at or near the time of this conveyance.    Her repeated dec-
larations were to the same effect, and that Mr. Avery's
money had paid for the property.

The trial court also found that there was an oral agreement
— an agreement made at the time the property was conveyed
to Mrs. Avery, that she should hold the property during her
lifetime, and that she should make a will by which it should
pass at her death to the Smithsonian Institution.    The Court
of Appeals held that the testimony did not establish the
alleged agreement so clearly as to justify a court of equity
in recognizing it as against the legal effect of the conveyance.
We are constrained to differ with the Court of Appeals and
to agree with the justice of the Supreme Court.    In a care-
ful and exhaustive opinion Justice Hagner reviewed the evi-
dence, and his conclusions therefrom commend themselves to
our judgment.    In view of this opinion it seems unnecessary
to recapitulate all the testimony, and we shall content our-
selves with stating the salient features thereof.

Mr. Avery was for some thirty-two years in the employ of
the Government, and was an enthusiast in the scientific studies
which he was pursuing in connection with such service.
Prior to the purchase of the lot in controversy, and on Sep-

tember 13, 1882, he had made a will, in which, after giving to his " wife Lydia T. Avery, if she outlives me, in trust while she lives, all my real estate and personal property . . . to hold and to use for her support as long as she lives, and to keep in good condition for its final disposition," he declared:

" Having always had a love for the sciences, and having acquired most of my property while toiling in humble capacities to extend and diffuse knowledge, I have concluded to give all my real and personal property, with such exceptions as I may make hereafter in this will or in codicils annexed thereto, to the Board of Regents of the Smithsonian Institution to provide for its safekeeping and to use the income from it in extending the sciences by publishing," etc.

And again:

" This fund may be called ' the Avery fund' or ' the fund contributed by Robert S. Avery and his wife Lydia T. Avery for the extension of the sciences,' and all publications made with this fund must have a note thereon stating that they have been thus published.

" After the death of my wife, the Board of Regents of the Smithsonian Institution will be expected to select an executor of this will and provide for making the fund as useful as possible, limiting its use as much as they can to the objects specified."

His wife was fifteen or twenty years younger than he, and the expectation of both was that she would outlive him, though in fact she died some four years before he did, he living to be 86 years of age. After her death, on December 20, 1892, he prepared a codicil to the will of 1882, in which he recited that the conveyance of the property in question was made to his wife with his consent and upon the express understanding and condition that she should make a will in his favor, and that he had as evidence of this filed several affidavits of her statements in respect to the matter. Subsequently he executed the will of July 22, 1893, under which this suit was brought. The wills and codicil above referred to furnish indisputable evidence that prior to the purchase of

the real estate in controversy Mr. Avery intended that all his property, after certain legacies were paid, should go to the Smithsonian Institution, and that he understood that when the deed of this property was made to his wife it was upon the agreement described. That the agreement was made is clearly and positively testified to by one witness, Leland P. Shidy, who was associated in the government service with Mr. Avery, was the intimate friend of both Mr. and Mrs. Avery, living in the house with them from time to time during the years from 1873 to her death. We quote from his testimony:

"Q. Do you recollect the circumstance of the purchase by Mr. Avery of the property No. 326 A street southeast, in this city?

"A. Yes; I do. I was at their house at the time when they began talking about making the purchase, and they discussed it, in the first place, as to the advisability of getting the property at all, and after that was decided they discussed as to how the deed had better be made out, and Mrs. Avery thought it would be best to put the deed in her name, although her husband's money was paying for it exclusively, and he thought best to do so and had the deed made out in her name.

"Q. Did Mrs. Avery state any reason why the deed should be made out in her name?

"A. Yes. She wanted it in her name, in the first place, because she wanted to have the control of that property, as it was immediately contiguous to her own home, and then she thought she would be pretty certain to outlive her husband, and that it would be better in case of his death to have the title in her name than in his name.

"Q. State what final disposition, if any, was agreed upon by these two persons in your presence.

"A. It was agreed that she should have the property during her lifetime, and that she should make a will transferring it at her death to the Smithsonian Institute.

"Q. I understand that this conversation which you are now testifying to took place at or about the time of the actual pur-

chase and the making of the deed. Was any reference made to the ownership of this property that you can now recollect subsequent to the date when it was bought?

"A. After that they referred to it in a number of interviews while I was present, and every time they alluded to it with the same understanding — that is, that the property was to be hers during her lifetime and was to be disposed of at her death, in accordance with the will of Mr. Avery, with the rest of his property."

In addition there was the testimony of several witnesses of repeated conversations with Mrs. Avery, in which she made statements to the same effect. In a lease of the property made in 1887 Mr. Avery was named as the lessor. The receipts for rent given monthly for several years were signed by him alone, and so signed in her presence. There is nothing to contradict or discredit this evidence. While it may be true that no witness but the one was present at the time the agreement was entered into between Mr. and Mrs. Avery, yet his testimony is corroborated in the various ways to which we have referred. There is no arbitrary rule requiring the direct testimony of any particular number of witnesses to the ultimate fact. It is enough that there be a certainty in respect to it, and that certainty may result from an accumulation of direct and indirect evidences. The law is content if from a perusal of the entire record the mind is sure that there was a distinct agreement as claimed. That Mr. Avery understood that the agreement was made as stated the documentary evidence places beyond doubt; that it was in fact made, Mr. Shidy's testimony attests; and that Mrs. Avery understood that it was so made is evident not merely from Mr. Shidy's testimony but from her statements to many others. The will executed in 1882, and before the purchase of this lot, discloses his intent that all his property, save a few specific bequests, should go to the Smithsonian, and that the fund created thereby should bear his wife's as well as his own name, and the evidence makes it clear that she shared in his desire to make this fund as large as possible. While we agree to the proposition that parol testimony to overthrow the legal effect

of conveyances must be clear and satisfactory, yet we think this case comes within the scope of that rule, and that it is certain that just such an agreement was made between husband and wife as the appellant asserts. Even if it were a criminal case, we should not hesitate to hold that the evidence was sufficient to establish the fact beyond a reasonable doubt. It is true Mr. Avery in the codicil speaks of the agreement on the part of Mrs. Avery as one to make a will in his favor, while Mr. Shidy says that the agreement was that she should make a will transferring the property after her death to the Smithsonian, but this slight difference is immaterial and does not discredit the testimony. The Smithsonian was to be the ultimate beneficiary, and the manner in which this should be accomplished was merely a matter of detail, in respect to which the memory of the witnesses might differ. Indeed, Mr. Shidy does not purport to give the exact language used, but merely states the substance of the agreement.

We pass, therefore, to the further question: If it is true that the purchase price was paid by Mr. Avery, and the title conveyed to Mrs. Avery under an oral agreement, such as is described, will equity enforce this as against those claiming the record title?

The Court of Appeals was of the opinion that the agreement on the part of Mrs. Avery created an express trust, which, resting only in parol was invalid under the statute of frauds. It recognized the doctrine that an implied or resulting trust arises by operation of law, whenever one person buying and paying for an estate has the title placed in the name of another; but held that where the title is conveyed to a wife or child, or other person for whom the one paying the purchase money is under an obligation, legal or moral, to provide, no presumption of a trust arises, and that it is incumbent on one who claims the existence of such a trust to establish it by clear, positive and unequivocal proof, and that this had not been done in the present case. It did not substantially disagree with Mr. Justice Hagner on the propositions of law laid down by him, but differed mainly as to the strength and effect of the evidence.

The general proposition is unquestioned that, where upon a purchase of property the conveyance of the legal title is to one person while the consideration is paid by another, an implied or resulting trust immediately arises, and the grantee in the conveyance will be held as trustee for the party from whom the consideration proceeds.

"This rule has its foundation in the natural presumption, in the absence of all rebutting circumstances, that he who supplies the purchase money intends the purchase to be for his own benefit, and not for another, and that the conveyance in the name of another is a matter of convenience and arrangement between the parties for collateral purposes, and this rule is vindicated by the experience of mankind." 1 Perry on Trusts, (4th ed.) § 126.

The nature of this trust may be shown by parol evidence. This is in express accord with the provisions of the statute of frauds. Comp. Stat. D. C. 231, §§ 8, 9. The first of these sections requires that all declarations or creations of trust or confidence in respect to real estate shall be manifested and proved by some writing. Section 9 reads:

"*Provided, always,* That where any conveyance shall be made of any lands or tenements by which a trust or confidence shall or may arise or result by the implication or construction of law, or be transferred or extinguished by an act or operation of law, then and in every such case, such trust or confidence shall be of the like force and effect as the same would have been if this statute had not been made; anything hereinbefore contained to the contrary notwithstanding."

There is no statute in force in this District, such as is found in some States, putting an end to implied and resulting trusts. It is true that when the consideration is paid by a husband and the conveyance made to his wife there is a presumption that such a conveyance was intended for her benefit; but this is not a presumption of law but of fact, and can be overthrown by proof of the real intent of the parties.

"Whether a purchase in the name of a wife or child is an advancement or not, is a question of pure intention, though presumed in the first instance to be a provision and settle-

ment; therefore, any antecedent or contemporaneous acts or facts may be received, either to rebut or support the presumption, and any acts or facts so immediately after the purchase as to be fairly considered a part of the transaction may be received for the same purpose. And so the declarations of the real purchaser, either before or at the time of the purchase, may be received to show whether he intended it as an advancement or a trust. Such declarations are received, not as declarations of a trust by parol or otherwise, but as evidence to show what the intention was at the time." 1 Perry on Trusts, (4th ed.) § 147; see also 2 Pomeroy's Eq. Juris. § 1041, and cases cited in notes.

This is in accord with the general proposition so often enunciated, that the statute of frauds was designed to prevent frauds, and that courts of equity will not permit it to be used to accomplish that which it was designed to prevent. As said in *Wood* v. *Rabe*, 96 N. Y. 414, 425 :

" There are two principles upon which a court of equity acts in exercising its remedial jurisdiction. . . . One is that it will not permit the statute of frauds to be used as an instrument of fraud, and the other, that when a person through the influence of a confidential relation acquires title to property, or obtains an advantage which he cannot conscientiously retain, the court, to prevent the abuse of confidence, will grant relief."

And in *Haigh* v. *Kaye*, L. R. 7 Ch. App. 469, 474 :

"The words of Lord Justice Turner, in the case of *Lincoln* v. *Wright*, 4 De G. & J. 16, where he said, ' The principle of this court is that the statute of frauds was not made to cover fraud,' express a principle upon which this court has acted in numerous instances, where the court has refused to allow a man to take advantage of the statute of frauds to keep another man's property which he has obtained through fraud."

If Mrs. Avery had during her lifetime conveyed this property to her sister and brothers it would have been a fraudulent breach of trust, and the like result follows if, now that she has died without executing a will, her heirs are permitted to take the property which was conveyed to her, not

as an advancement, but on an agreement that it should subsequently pass to this plaintiff.

The existence of an express agreement does not destroy the resulting trust. It was not an agreement made by one owning and having the legal title to real estate by which an express trust was attempted to be created, but it was an agreement prior to the vesting of title — an agreement which became a part of and controlled the conveyance ; and evidence of its terms is offered, not for the purpose of establishing an express trust, but of nullifying the presumption of an advancement and to indicate the disposition which the real owner intended should be made of the property.

In *Robinson* v. *Leflore*, 59 Mississippi, 148, 151, it was said : "If the facts make out a case of resulting trust independently of the agreement, relief will not be denied because of the agreement ; it being well settled that an invalid agreement cannot destroy an otherwise good cause of action, and this is no less true of resulting trusts than of other legal rights." *Keller* v. *Kunkel*, 46 Maryland, 565.

It may not be amiss to notice a few of the authorities. *Sherman* v. *Sherman*, 20 D. C. Rep. 330, is in point. In that case the husband made an agreement with his wife to buy real estate in her name, and that she should execute a will devising it to him. He bought one piece of real estate in her name, and she made a will so devising it. Subsequently he, in like manner, bought another piece, and, under the supposition that the will covered this after-acquired property, she made no new will, but died intestate as to that property, and it was ruled that a minor daughter, who inherited the title, held it in trust for him. In *Livingston* v. *Livingston*, 2 Johns. Ch. 537, it appeared that husband and wife agreed orally that he should purchase a lot in her name and build a house thereon, and that he should be reimbursed the cost thereof out of the proceeds of another house and lot of which she was seized, which should be sold for that purpose. The husband having executed the agreement upon his part, the contract failed by the sudden death of the wife, who left infant children, to whom the legal estate in both lots descended ; and

it was held that the agreement should be carried into effect, and the lot which originally belonged to the wife was ordered to be sold and the husband reimbursed out of the proceeds. In his opinion the Chancellor said (p. 539) :

"The presumption would undoubtedly be, in the first instance, that the conveyance to the wife was intended as an advancement and provision for her. This presumption was admitted in the case of *Kingdon* v. *Bridges*, 2 Vern. 67, but I do not see why it may not be rebutted, as has been done in this case, by parol proof. In *Finch* v. *Finch*, 15 Vesey, 43, it was held, that though when a purchase is made in the name of a person who does not pay the purchase money, the party paying it is considered in equity as entitled, yet if the person whose name is used be a child of the purchaser, it is, *prima facie*, an advancement, but that it was competent for the father to show, by proof, that he did not intend advancement, but used the name of his child only as a trustee."

*Cotton* v. *Wood*, 25 Iowa, 43. Here the facts were that the husband purchased a lot and had the same conveyed to his wife under an agreement that she would convey it to him, or to whomsoever he might assign his interest therein, upon his request. The wife died without making any conveyance, and it was held that the husband might maintain a suit to compel a conveyance to him by her heirs, the court saying :

"Where, upon the purchase of property, the consideration is paid by one, and the legal title conveyed to another, a resulting trust is thereby raised, and the person named in the deed will hold the property as trustee of the party paying the consideration. See Hill on Trustees, 91, and authorities cited in notes; 2 Story's Eq. Juris. § 1201. But if the person to whom the conveyance is made be one for whom the party paying the consideration is under obligation, natural or moral, to provide, the transaction will be regarded *prima facie* as an advancement, and the burden will rest on the one who seeks to establish the trust for the benefit of the payee of the consideration, to overcome the presumption in favor of the legal title by sufficient evidence.

"This presumption, though strong, is not conclusive. Hill

on Trustees, 97, and notes; *Sunderland* v. *Sunderland*, 19 Iowa, 328; *Livingston* v. *Livingston*, 2 Johns. Ch. 540; 2 Story's Eq. Juris. § 1203; 2 Washburn, Real Property, 173, 174, 204; *Welton* v. *Devine*, 20 Barb. 9; *Guthrie* v. *Gardner*, 19 Wend. 414; *Harder* v. *Harder*, 2 Sandf. Ch. 17." See also *Gray* v. *Jordan*, 87 Maine, 140; *Milner* v. *Freeman*, 40 Arkansas, 62; *Hudson* v. *White*, 17 R. I. 519; *Persons* v. *Persons*, 25 N. J. Eq. 250.

Somewhat analogous is *In re Duke of Marlborough*, L. R. 2 Ch. Div. 1894, 133, in which it appeared that the Duchess of Marlborough conveyed certain property to her husband, that he mortgaged the property for the purpose of raising money with which to pay his debts, she joining in the mortgage. Upon his death the Duchess claimed to be entitled to the property, subject to the mortgage, on the ground that it was part of the arrangement between them that he should reconvey to her, and it was held that she was entitled to such reconveyance.

We think it clear from these authorities, and many others that might be cited, (see White and Tudor's Leading Cases in Equity, (4th ed.) vol. 1, part 1, p. 314 and following, where the authorities are collated and the question discussed at length,) that the doctrine of an implied and resulting trust applies to a case in which the husband advances the purchase price for property which is conveyed to his wife, and that though it be true there is a presumption that the conveyance was intended as an advancement for her benefit, yet such presumption is subject to overthrow by proof of an agreement that such was not the purpose of the conveyance. And so the case comes back to the question of fact in respect to which we have already expressed our conclusions, whether there was sufficiently clear and positive evidence that this conveyance to Mrs. Avery was not intended as an advancement, but was made simply for the purposes of convenience and upon the agreement that this lot, together with other property belonging to Mr. Avery, should pass after both were dead to the Smithsonian Institution.

The remaining question arises upon the condition named in

the will, and its effect upon the legacy to the sister and
brothers of Mrs. Avery. That these legatees did not acqui-
esce in the will is clear, not alone from the fact that prior to
any suit they made demand for the possession of the realty,
but also from the further fact that after the decree in the
trial court, which, while denying any right to the real estate,
at the same time provided for their receipt of the legacy upon
filing a written relinquishment of all claims to the real estate,
they persisted in carrying on the litigation by appeal to the
Court of Appeals, insisting there as here upon their right to
the property. It is obvious that in inserting this condition
the testator had in mind the specific property hereinbefore
considered. In the first will, made prior to the purchase of
the property, no such provision is found. He was under no
apprehension of any dispute as to the proposed disposition of
his entire estate. But in a second codicil thereto executed
after the death of his wife, and when, by her failing to exe-
cute a will as agreed upon, it became apparent that some
question might be made concerning the ownership of this
property, he did incorporate a somewhat similar provision.
There is, however, a marked difference between the language
there used and that here found. That language was, "these
gifts are made on the condition that no attempt be made to
break this will, and that if such an attempt be made, those
who engage in it are to lose their claims to the gifts here
made to them." That might be construed to forbid, under
the penalty of losing the bequests, a contest of the will, any
"disputing of the will," in the ordinary and natural meaning
of those words, by denying that it was a lawful will, duly
executed and attested by a testator of sound mind and not
acting under undue influence. The language here used is
that "these bequests are all made upon the condition that the
legatees acquiesce in this will, and I hereby bequeath the
share or shares of any disputing this will to the residuary
legatee hereinafter named." In other words, acquiescence in
the will as a will, and in all its provisions, is the condition
upon which the legatees can take their bequests. It is not
confined to mere acquiescence in his selection of the residuary

legatee, but in his declaration as to the title to any named property and his devise of that property. No legatee is to receive a bequest who shall controvert that which he has stated to be a fact, or attempt to prevent that specific disposition of any property which he has made. And in case of a failure to comply with this condition the bequest is given over to the residuary legatee. The authorities fully warrant this conclusion.

" When legacies are given to persons upon conditions not to dispute the validity of, or the dispositions in wills or testaments, the conditions are not in general obligatory, but only *in terrorem.* If, therefore, there exist *probabilis causa litigandi,* the non-observance of the conditions will not be forfeitures. *Powell* v. *Morgan,* 2 Vern. 90; *Morris* v. *Burroughs,* 1 Atk. 404; *Loyd* v. *Spillet,* 3 P. Wms. 344. The reason seems to be this: A court of equity does not consider that the testator meant such a clause to determine his bounty, if the legatee resorted to such a tribunal to ascertain doubtful rights under the will, or how far his other interests might be affected by it; but merely to guard against vexatious litigation.

" But when the acquiescence of the legatee appears to be a material ingredient in the gift, which is made to determine upon his controverting the will or any of its provisions, and in either of those events the legacy is given over to another person, the restriction no longer continues a condition *in terrorem,* but assumes the character of a conditional limitation. The bequest is only *quousque,* the legatee shall refrain from disturbing the will; and, if he controvert it, his interest will cease and pass to the other legatee." 1 Roper on Legacies, 2d Am. Ed. 795 ; 4th Lond. Ed.

In *Cooke* v. *Turner,* 14 Sim. 493, the testator after giving to his daughter certain benefits out of his real estate revoked them and gave the estates over in case his daughter should dispute his will, or his competency to make it, or should refuse to confirm it when required by his executors. The daughter refused to confirm the will, and a suit having been instituted to establish it the daughter disputed its validity and the compe-

tency of her father to make it. It was held that the clause of revocation was valid; that the gift over took effect, and that the benefits given by the will to the daughter were forfeited by that which had taken place.

It is said in 2 Redfield on Wills, p. 298, in treating of the rule as to conditions against disputing the will, that "acceptance of the legacy renders the condition binding upon the legatee, upon the well-known doctrine of election." Election is thus defined by Sir William Grant, Master of the Rolls, in *Andrew* v. *Trinity Hall*, 9 Ves. 525, 533: "Where one legatee under a will insists upon something, by which he would deprive another legatee under the same will of the benefit, to which he would be entitled, if the first legatee permitted the whole will to operate."

This thought finds apt illustration in the case at bar. These legatees insist that the devise of this particular real estate to the plaintiff shall not stand; that it was not the property of the testator, and could not lawfully be devised by him, and therefore that the plaintiff shall not take the property which the testator proposed to give it. If, however, they had accepted this legacy burdened with the condition named, might it not fairly be said that they elected to acquiesce in the will and in the disposition specifically made by the testator of this property? Redfield in the same volume on page 370, after citing *Morrison* v. *Bowman*, 29 California, 337, in which this subject was considerably discussed, states as one of the propositions therein established:

"Although the testator has no legal power to dispose of the property of another, yet if he assumes to do so by his will, and such person accepts a devise or bequest under the will, it will be a confirmation of such disposition of his own property by the testator."

In *Beall* v. *Schley*, 2 Gill, 181, 200, the court said:

"It is only carrying out a plain intent of the testator, and giving to the residuary devisee that which the testator intended, and forbidding the heir from taking property not designed for him. From the earliest case on the subject, the rule is, that a man shall not take a benefit under a will, and

at the same time defeat the provisions of the instrument.    If he claims an interest under an instrument, he must give full effect to it, so far as he is able to do so.    He cannot take what is devised to him, and, at the same time, what is devised to another; although, but for the will, it would be his; hence he is driven to his election to say, which he will take."    See also 1 Jarman on Wills, 415 ; 2 Story's Eq. Juris. § 1076.

The propositions thus laid down fully commend themselves to our approval.    They are good law and good morals.    Experience has shown that often after the death of a testator unexpected difficulties arise, technical rules of law are found to have been trespassed upon, contests are commenced wherein not infrequently are brought to light matters of private life that ought never to be made public, and in respect to which the voice of the testator cannot be heard either in explanation or denial, and as a result the manifest intention of the testator is thwarted.    It is not strange, in view of this, that testators have desired to secure compliance with their dispositions of property and have sought to incorporate provisions which should operate most powerfully to accomplish that result.    And when a testator declares in his will that his several bequests are made upon the condition that the legatees acquiesce in the provisions of his will, the courts wisely hold that no legatee shall without compliance with that condition receive his bounty, or be put in a position to use it in the effort to thwart his expressed purposes.

*The decree of the Court of Appeals will be reversed, and the case remanded to that court with instructions to enter a decree in conformity with this opinion.*

The CHIEF JUSTICE did not sit in this case, and took no part in its consideration and judgment.