### RUSSELL v. RUSSELL et al.

(Circuit Court, D. New Jersey. April 15, 1904.)

1. RES JUDICATA—MATTERS CONCLUDED BY DECREE.

The questions concluded by a decree in equity, where the cause was appealed, are determined by the opinion of the appellate court. The parties are not concluded as to questions which were left open by such opinion, although they may have been passed on by the court below.

2. SAME.

Complainant brought a suit for the reformation of an antenuptial agreement, and for its specific enforcement as reformed; it being alleged that, as written, it was procured by fraud. The court, on a hearing, dismissed

the bill on the ground that the agreement could not be varied by parol, and also that the evidence was insufficient to show fraud in its procurement. On appeal the decree was affirmed, but the court, in its opinion, stated that it was not necessary to enter upon the question of fraud, because it appeared that complainant had received and retained a partial payment from the executors under the agreement, and was therefore not in a position to repudiate it. *Held,* that the decree in such suit was not a bar to a second suit by complainant to impeach and set aside the agreement, in which she offered to return the amount received and paid it into court.

3. EQUITY—DEFENSE OF LACHES.

A widow will not be held barred by laches from maintaining a suit to set aside an antenuptial agreement for fraud, instituted at once after the unsuccessful termination of a prior suit for its reformation, which was commenced within a year after her husband's death, and where she at all times asserted the invalidity of the agreement.

4. TENDER—NECESSITY AS CONDITION PRECEDENT TO SUIT.

A tender back of a payment made to a widow by her husband's executors is not necessary, as a condition precedent to her right to maintain a suit to set aside an antenuptial agreement, where, in any event, she was entitled to a larger amount from the estate.

5. ANTENUPTIAL AGREEMENTS—VALIDITY—PRESUMPTIONS.

Where the provision made for a wife by an antenuptial agreement is grossly disproportionate to the rights surrendered, the presumption is that the agreement was brought about by fraudulent concealment, and the burden rests upon those who would profit by it to show otherwise.

6. WITNESSES—COMPETENCY—TESTIMONY AS TO TRANSACTIONS WITH DECEDENT.

Rev. St. 858 [U. S. Comp. St. 1901, p. 659], which provides that, in suits by or against executors in which judgment may be rendered for or against them, neither party shall be allowed to testify against the other as to any transaction with or statement by the testator, unless called by the adverse party or the court, does not prevent a widow from giving testimony with respect to the making of an antenuptial agreement in a suit by her to recover her dower estate in the property of her deceased husband, to which his executors are only nominal parties, against whom no judgment could be rendered.

7. ANTENUPTIAL AGREEMENT—VALIDITY—IMPEACHMENT FOR FRAUD.

An antenuptial agreement provided that the intended wife should receive $5,000, within a stated time after her husband's death, in lieu of dower, and in addition to what might be given her by her husband's will. She signed the agreement at his solicitation, without any knowledge of the amount of his property, and on his representation that he would provide liberally for her by his will, and that the amount to be paid her under the agreement would be ample for her until his estate could be settled. He owned real estate which at the time of his death, five years later, was valued at $117,000, and personal property exceeding $100,000 in value, which, under the laws of the state, he could dispose of by will free from any claim on her part. By his will he gave her certain stocks, not exceeding $1,500 in value. *Held* that, in view of the confidential relations existing between the parties, the widow was entitled to have the agreement set aside for fraud, and to recover her dower interest in his realty.

8. SAME—FRAUD—VIOLATION OF PROMISE.

The failure to fulfill an executory promise made to secure the consent of a woman to an antenuptial agreement may constitute a fraud which will invalidate the agreement.

In Equity. On final hearing.

John H. Hazelton, for complainant.
David J. Pancoast and Walter H. Bacon, for respondents.

¶ 5. See Husband and Wife, vol. 26, Cent. Dig. § 165.

ARCHBALD, District Judge.[1]  The purpose of this bill is to set aside an antenuptial agreement on the ground of fraud.  The complainant, Lottie R. Russell, is the widow of John Russell, late of Leesburg, N. J., deceased, to whom she was married November 30, 1892, and who died July 20, 1897.  Mr. Russell was 75 at the time of the marriage, and Mrs. Russell 50, and both had been previously married.  Mr. Russell had no children living, but had three grandchildren; and Mrs. Russell had two adult sons, George R. and Grant Brown.  By the antenuptial agreement, which was executed November 22d, a few days before the marriage, it was provided that there should be paid to Herschel Mulford, as trustee for Mrs. Russell, out of the estate of her husband, within six months after his decease, the sum of $5,000, which was to be in lieu and satisfaction of dower, and a bar to any claim upon his personal estate, unless some part of it should be given to her by will.  Mr. Russell was at the date of this agreement and at the time of his death a man of considerable wealth; having realty estimated at $105,000, and personal estate of about $117,000, or $222,000 in all.  It is charged that the agreement was secured by him, not only by concealing from his prospective wife the extent of his property, but by actually misrepresenting its condition and value, and particularly by promising to provide liberally for her in his will, which he failed to do.  A will was executed by Mr. Russell February 18, 1896, without the knowledge of his wife, while they were on a pleasure trip in Florida; and by it, in addition to the $5,000 named in the antenuptial settlement, he simply gave her 10 shares of stock in the Glassboro National Bank, of the value of twelve or fifteen hundred dollars.  Mrs. Russell was very much disappointed when she found out after his death how little he had left her, and, upon complaint to the others interested in the estate, there was some talk of a liberal increase of it by amicable arrangement, but none was reached.  The executors subsequently paid to the trustee $500 of the $5,000 called for by the agreement, and the trustee on December 16, 1897, turned this over to Mrs. Russell, which, after taking the advice of counsel, and being assured that it would not prejudice her, she accepted and receipted on account.  Being notified by the trustee, later on, that the rest of the $5,000 was ready for her, but being required to execute a formal release, she declined to accept it; and, conceiving in the end that she had been overreached, on June 2, 1898, she filed a bill in the Court of Chancery of New Jersey to assert her rights. This bill was against the same parties who are respondents here, and, relying in substance on the facts which have been stated, it prayed that the antenuptial agreement should be decreed to be of no effect, and be delivered up to be canceled; that the promise of her husband to make a liberal provision for her should be specifically enforced, by paying to her not less than one-third of the net personal estate, in addition to the value of her dower in the realty; and that the will should be declared to have been in fraud of her rights, and be made null and void so far as it stood in her way.  The respondents having answered, the case was heard by Vice Chancellor Grey, who on August

[1] Specially assigned.

16, 1900, filed an opinion in which he advised that the bill be dismissed, and a decree was subsequently entered in accordance therewith. Russell v. Russell, 60 N. J. Eq. 282, 47 Atl. 37.

The case was considered by the vice chancellor as proceeding upon two grounds: First, to reform the antenuptial agreement so as to embody the undertaking by Mr. Russell to provide liberally for the complainant in his will; and, secondly, to set aside the agreement, as induced by misrepresentation and fraud, in order to make way for the claim of dower in the realty. As to the former it was held that the agreement, being in writing and complete in itself, could not be varied by an added term resting in parol, both on account of the established rule in this regard, as well as the fact that, being based on the consideration of marriage, the statute of frauds was an insurmountable bar; and, as to the second, that fraud in inducing the execution of the agreement, as made, was no ground for the specific performance of it, as not made. Recognizing, however, that relief for the complainant must come, if at all, by setting aside the agreement, so as to let her into her dower rights, and proceeding to consider the alleged fraud in its procurement in order to dispose of the whole case, it was pointed out that there was no misrepresentation by Mr. Russell as to its terms, which were perfectly plain and in accordance with what had been previously discussed; that Mrs. Russell took time to consider it, and submitted it to her sons for advice; that there was nothing inconsiderate in its provisions, having regard to the age and relative position of the parties, and the uncertain condition of some of Mr. Russell's property; and that there was no proof that it was executed by Mrs. Russell without full knowledge of the extent and value of his estate, nor any such discrepancy between that which was given her by the antenuptial agreement and will, and her dower rights, which were alone involved (there being an absolute right in the husband, by the laws of New Jersey, to dispose of the whole of his personal estate by will), as to raise the presumption that she was not fairly dealt with. Confirmatory of this view, it was noted that on December 22, 1897, more than four months after the will was proved, Mrs. Russell accepted $500 on account of her portion, and was under treaty to receive and invest the rest of it; the only explanation of this course being that she acted without the advice of counsel, which was not regarded as sufficient to do away with its effect. The fact that in reality she acted upon the advice of counsel was not disclosed.

From the decree so entered against her, Mrs. Russell appealed to the Court of Errors and Appeals, but the decision was affirmed. 63 N. J. Eq. 282, 49 Atl. 1081. On the question whether she was entitled to ingraft upon the antenuptial agreement the parol contract which she asserted that liberal provision should be made by the testator in his will, the same view was taken as by the vice chancellor. But with regard to setting the agreement aside for fraud, the court declared that it was not necessary to express an opinion, Mrs. Russell not being in shape to repudiate the agreement, having accepted $500 under it. "It is entirely settled," says Gummere, J., "that a party to a contract cannot at one and the same time repudiate it, and retain a benefit from its partial execution. In order to entitle him to rescind, he must

first restore what he has received under the contract, and thus put the other party to the agreement in his original position. * * * This the appellant has not done, and consequently does not stand in a position which entitles her to an annulment of the contract, even if it be true, as she alleges, that she was induced to enter into it by fraud on the part of her husband."

This decision was made August 23, 1901, and the present suit was instituted November 15 following; the complainant having meanwhile become a citizen of New York. The question whether the conclusion reached in the one is a bar to the other stands at the threshold of the case, and has first to be disposed of. It is earnestly contended by the respondents that it is, but upon that there is considerable to be said. It is to be noted, in the first place, that, while there was a prayer in the former case to have the antenuptial agreement set aside on account of the fraud alleged to have been practiced upon the complainant, yet, as pointed out by the vice chancellor, this was merely as the basis, and to make way, for the reformation of the agreement, and its specific enforcement in its modified form. Except as so subordinated, there was, in strictness, an inconsistency in the two positions. The complainant was not entitled to have the agreement established and enforced in the shape she contended it ought to be, and at the same time entirely annulled. It is, no doubt, true, however, that the vice chancellor did not stop at this, but, taking the avoidance of the agreement as a matter of independent and alternative relief, passed upon it, and decided adversely to the complainant's rights. If, then, the case stood on his rulings, she would be unquestionably concluded by them. But the appeal removed the case in its entirety to the higher court, and it is the judgment there rendered that must control, which has to be determined by the views expressed by the court in the opinion filed. As said in Larkins v. Lindsay, 205 Pa. 534, 55 Atl. 184:

"A decree in equity is not, like a judgment at law, necessarily conclusive as to every matter which either was or might have been involved in the decision. Regard must be had to the reasons of the chancellor as well as his decree, for, to take the most obvious illustration, the case may have been disposed of on grounds of adequate remedy at law, or other reasons not involving the merits."

Unless, therefore, the rights of the complainant which are now sought to be litigated were directly disposed of in the final judgment rendered, as disclosed by the opinion of the Court of Errors and Appeals, they are not barred. This is squarely ruled in Turley v. Turley, 85 Tenn. 251, 1 S. W. 891, where it was held that a question left open by the opinion of the appellate court, although passed upon by the court below, could be re-examined in a subsequent suit where it was directly raised. It is true that there was a reversal in that case, and not an affirmance, but that is not material. As is there said, the appeal vacated the decree below, and brought up the whole case for review; and, the court of last resort having declined to decide the question subsequently mooted, it was left open for future determination. In this connection, also, the case of Stewart v. Ashtabula, 107 Fed. 857, 47 C. C. A. 21, is instructive. On a previous bill filed by the plaintiff to establish his right to maintain a street railway, it

had been decided that he had failed to comply with the village ordinance which granted him that privilege, and that the village had the right, in consequence, to remove the tracks and ties. But this decision was held not to estop him from maintaining an action for damages for the wrongful conversion of this property after it had been removed, even though an account for such damages might have been ordered by the court, had the plaintiff's right been sustained, and it had been specifically found in the former suit that the tracks and ties, after their removal, had been piled up and held at the order of the plaintiff; this finding not being essential to the decision made.

The ultimate conclusion reached in the former suit, as expressed in the opinion of the Court of Errors and Appeals, must therefore determine how far it is a bar in this. Looking into the opinion, it unquestionably disposes of the complainant's right to reform by parol the antenuptial agreement, and have it specifically enforced. But passing by the question whether a fraud was perpetrated upon her in its procurement, it was held that she was not entitled to raise that issue, because she had accepted $500 of the money given her by the agreement, which she could not retain in affirmance of it, and at the same time move to rescind. The decision so made, to the extent indicated, must be accepted in its entirety, and leaves nothing open that was involved. It cannot be qualified by the suggestion with respect to the $500 that due consideration was not given to the fact that, whichever way the case was decided, the complainant would be entitled to this amount; nor yet that in accepting it she acted under the advice of counsel, which was not disclosed. The latter circumstance, if material, was well known to her, and should have been brought forward as part of her case. She may have been misadvised as to its materiality, but, while that will explain the omission, it does not overcome it. But on the other hand, the decision is not to be carried beyond its terms. The allegation of fraud was not disposed of, because it was not considered necessary to do so, nor whether the complainant, by an offer to return, such as is now made, could qualify herself to reassail the agreement upon that ground. It was simply decided that she was not in a position to do it at that time. It follows, therefore, that the question of fraud is open for consideration, provided it is not made too late, of all of which this court is entitled to judge, regardless of anything that has gone before.

To meet the objection which proved fatal to her former case, the complainant has offered in the present bill to return the $500 she received, and has followed this up by paying the money into court. She has also paid in the dividend of $30, put to her credit by the executors, from the bank stock. It is claimed that this is ineffective at this stage, and after the interval which has elapsed, and particularly without a tender before suit brought. It is the undoubted rule, where fraud in the procurement of a contract is intended to be relied on to avoid it, that the party defrauded must assert his rights with reasonable promptness. The transaction is not void, but voidable, and delay will ordinarily be regarded as a waiver and affirmance. Byard v. Holmes, 33 N. J. Law, 119; Dennis v. Jones, 44 N. J. Eq. 513, 14 Atl. 913, 6 Am. St. Rep. 899; Grymes v. Sanders, 93 U. S. 55, 23 L. Ed. 798. But

circumstances alter cases, and each must be governed by its own. In the present instance it has been the manifest intention of the complainant from the outstart not to abide by the antenuptial agreement as it was written, which it would do violence to her actions not to recognize and uphold. She receipted for the $500 only on the advice of counsel that it would not prejudice her, and refused to take more and sign a release when she found it would. Her former bill was filed within a year of her husband's death, and distinctly asserted the invalidity of the agreement; demanding specific performance of the parol understanding by which it was modified, instead. On the hearing upon it she relied on and gave evidence of the fraud which had been practiced upon her, and, when that suit failed for the reasons specified, she promptly began the one in hand. While, therefore, it may be true, as decided by the Court of Errors and Appeals, that she was not in a position to disaffirm so long as she held on to even a part of that which she obtained under the agreement; yet, outside of that, by the most positive and persistent acts, which could not be misunderstood, she has consistently asserted the invalidity of the agreement as it stood, and manifested her determination not to be bound thereby. Finally, to remove all questions, she now not only offers to return what she received, but has actually paid the money into court, thus surrendering every vestige of benefit from it. If this is not sufficient, she is held to a very rigorous rule. It is true, she made no tender before suit brought; but considering that, whether she wins or loses, considerably more than this will be due her, it does not seem requisite that she should. The rights of the parties can be entirely protected by the final decree. Billings v. Aspen Mining Co., 51 Fed. 338, 2 C. C. A. 252; Thackrah v. Haas, 119 U. S. 499, 7 Sup. Ct. 311, 30 L. Ed. 486; Sloane v. Schiffer, 156 Pa. 59, 27 Atl. 67. If this is in conflict with the local law, which it does not seem to me it necessarily is (Pidcock v. Swift, 51 N. J. Eq. 405, 27 Atl. 470), the case is not one where the state law governs, but is to be disposed of by the court according to its own views of what is equitable and right.

On the question of fraud in the procurement of the agreement, one cannot fail to be impressed with the disproportion between the estate of which the decedent was possessed and that which was secured to the complainant therefrom. Notwithstanding that Mr. Russell was worth nearly a quarter of a million of dollars—$105,000 in real estate, and $117,000 in personalty—all she got for the surrender of her dower rights was $5,000, to be paid her within six months after his death, and such additional remembrance as he might be moved to give her by will. According to the sequel, this proved next to nothing— the 10 shares of bank stock not exceeding $1,500 in value—and, if the respondents' contention be sustained, it did not have in reality to be even that. In passing, therefore, upon the agreement as written, it must be remembered that the whole consideration of the bargain to Mrs. Russell was the $5,000 named. It is idle to argue that this was anything but what was close and narrow. If there was no great disparity in it, why this long and expensive litigation, which might have been amicably avoided, according to the evidence, for a very moderate advance, in order to keep the complainant out of her dower? With-

out stopping to go into an extended demonstration, it is not difficult to figure out a yearly value of over $4,000 from the productive real estate, outside of possible returns from the timber lands, of which the complainant would be entitled to a third; and, holding down to this low estimate, in four years she would equal what she was to get by the agreement, and, if her expectation of life was fulfilled, would far exceed it in the end. No one with knowledge of the facts, or except because of a confidence inspired, would make such a one-sided bargain. No account is taken in this calculation of the personal property, but it is manifest that it cannot be entirely left out of sight. While the complainant could acquire no legal claim upon it by the marriage, as has been already noted, yet it constituted a material part of Mr. Russell's possessions, and contributed to make him the man of wealth which he was. Bearing on future possibilities, as it did, it is a factor to be considered in determining whether the bargain was a fair one; and, with this thrown into the scale, even though no more than as a makeweight, the disparity is materially increased.

The law which governs in such cases is universal and well defined. Kline v. Kline, 57 Pa. 120, 98 Am. Dec. 206; Bierer's Appeal, 92 Pa. 265; Warner's Est., 207 Pa. 580, 57 Atl. 35; Pierce v. Pierce, 71 N. Y. 154, 27 Am. Rep. 22; Taylor v. Taylor, 144 Ill. 436, 33 N. E. 532; Fisher v. Koontz, 110 Iowa, 498, 80 N. W. 551; Spurlock v. Brown, 91 Tenn. 241, 18 S. W. 868. The parties who enter into an antenuptial arrangement stand in such a relation of confidence to each other as to call for the exercise of the highest fairness and good faith. It cannot be expected that either will pry into the money affairs of the other, except possibly in the most general way; or conduct an independent investigation with regard to them. The amenities of the situation forbid it, if nothing else. It is too suggestive of a mercenary motive in the marriage, which should be prompted by mutual affection, to be sanctioned. Each must therefore, of necessity, derive knowledge from the other of his or her property, and both must be frank. No agreement on any other basis will stand, as all the cases attest. Where the bargain is manifestly unfair, as where the provisions made by it on either side are inadequate or grossly disproportioned to the rights surrendered, the presumption is that it was brought about by fraudulent concealment, and the burden is upon those who seek to profit by it to show otherwise, which is as it should be, for the additional reason that the mouth of the one party is usually closed by the death of the other.

But we do not need to rest the case upon presumptions. There is direct evidence of that which preceded and induced the agreement which leads to the same result. So far as this depends on the testimony of the complainant, she is a competent witness, notwithstanding that it relates to a transaction with the respondents' testator, now deceased. She may not be by the state law, but the case falls within the terms of the federal statute, which therefore controls. Potter v. Third National Bank, 102 U. S. 163, 26 L. Ed. 111. The Revised Statutes (section 858 [U. S. Comp. St. 1901, p. 659]) declare that:

"In the courts of the United States no witness shall be excluded * * * in any civil action because he is a party to or interested in the issue to be

tried: provided, that in actions by or against executors, administrators or guardians in which judgment may be rendered for or against them neither party shall be allowed to testify against the other as to any transaction with or statement by the testator, intestate, or ward, unless called to testify thereto by the opposite party, or required to testify thereto by the court."

To the extent that this is a suit against executors, two of the defendants being sued in their representative as well as their individual capacity, it falls within the proviso of the statute, but the other condition of exclusion is not fulfilled. No judgment for or against the executors is asked by the bill, or could be rendered thereon. It is brought to secure the complainant's dower in the lands of her late husband, and is essentially against the heirs and devisees to whom it descended or was left by his will, and not against the executors, except nominally. 7 Encycl. Plead. & Pract. 197; Chapman v. Schroeder, 10 Ga. 321; Campbell's Case, 2 Doug. (Mich.) 141. The personal property being disposable by the testator without accountability, no claim is or could be made against it; and, the estate being solvent, the realty is not needed for payment of debts. Neither are the executors given any duties by the will with respect to it, and if, as it seems, they have intervened in any way, they must be regarded as having done so, not on behalf of the estate, but as agents for those interested therein. 11 Am. & Eng. En. Law (2d Ed.) 1208. The proceeding is therefore distinctly in rem, except so far as the rents and profits which have accrued are concerned; or as compensation may be claimed for lands disposed of by the testator in his lifetime; and even as to this it cannot be said that the general estate in the hands of the executors is involved. The case is like that of Goodwin v. Fox, 129 U. S. 601, 9 Sup. Ct. 367, 32 L. Ed. 805, where, although the plaintiff sued, in terms, as executrix, the defendant was held to be a competent witness; the relief sought being only with regard to her interest in certain land as devisee.

Turning, then, to the facts with regard to the making of the antenuptial agreement in controversy, and bearing in mind that the parties became engaged in August, 1892, and were married November 30 following, the story of how it came to be executed will best be told in the words of Mrs. Russell, taken entire. Being asked to state what took place between herself and Mr. Russell with regard to it, she said:

"He said there was a little matter he wished to speak to me about. This was in the month of October. I said: 'Very well. Go ahead.' He said that in all probability I would outlive him, and that he wanted to provide for me, and he asked me what part of his estate I would be satisfied with at the time of his death. I told him that I didn't know; that I had never thought anything about that. I said: 'I don't really know what you are worth—what you claim to be worth. What would you like to give me?' He said: 'Well, I want to make you satisfied, and I will do so, but I wish you would mention a sum.' I said: 'Well, I can't do that, because I don't know anything about what you are worth.' He said: 'Well, I don't either. My business is in such a condition that I don't know how I am standing, but I want to give you something that will make you independent at the time of my death. I think that would be better for us both.' I said: 'Well, if you think so, what would you like to give me?' He said: 'Well, how would $15,000 suit you—to receive it within six months after my decease?' I said that that would be all right; that I would be satisfied with that. He said: 'As soon as we are married, I shall make my will, and I want to fix you so you will be independent.' I said: 'Very well. That will be satisfactory.' And he said: 'I will give you something in my will, too.' So we talked a

little while, and after a few minutes he said: 'That is rather more than you will need, and I don't think it would be best to give you quite that much. It might put my executors to considerable trouble, and some losses, to raise that amount within six months. How would $10,000 suit for the time, and then I will provide for you in my will?' I said: 'That is all right. That is satisfactory, too, if you think it is best.' Then he said: 'I think it would be better for us to have a writing drawn up—an agreement—and it would be better for you and better for me. Who shall we have to draw it up?' I said: 'Any one you say. I don't know anything about anybody who ought to do it.' He said: 'I have had a good deal of dealings with Potter & Nixon, of Bridgeton, and I think I will go to them, if it suits you.' I said: 'It suits me all right.' That was about all that was said in regard to the matter at that time. Then in a few days he went to Bridgeton, and saw Potter & Nixon, and in a day or two I received an agreement through the mail, and it was drawn for $5,000; but I thought it was a mistake of the lawyers or the typewriter. I didn't think that Mr. Russell had made the change. So I just put it aside and waited till he called, which was in a very short time— a day or two, perhaps. As soon as he came in he said: 'Did you receive an instrument in writing through the mail?' I said I did, and he said: 'So did I.' I said: 'Did you?' He said: 'Yes.' He then said: 'What did you think of the change I made?' I said: 'Did you make that change? I thought it must have been a mistake.' And he said: 'No. If you will sit down, I will tell you why I made it in that way.' So I did, and listened to him. He said that, after considering the matter thoroughly, he thought that that would be sufficient to carry me through till his estate was settled, and said that he would provide liberally for me in his will. He said: 'Perhaps I could leave what I leave you in my will already invested, or I may leave it to you in cash. I will see what is best. I want to fix it so that you will have no trouble with it.' He then asked me: 'What do you think of that arrangement?' I said: 'If you think that is better, I am willing for you to do just what you think is best.' He said: 'I don't want you to think that this $5,000 is all that I intend you to have. You see right here at the bottom I have left a space where I can make a provision for you, and that is why I did it, and had it left open.' He then said: 'Do you think you understand it?' I said: 'I think I do.' He said: 'Well, I will do as I say, and I think it will be the best way to do.' He said: 'Can you trust me?' I said: 'I think I can. If I cannot, we had better stop right here, without going any further. I want to trust my husband.' He said: 'I thank you for your confidence, and you may rest assured that I will do just what I say, and make a liberal provision for you in my will, after we are married, for I don't know who could have a greater claim on what I have than my wife.'"

And again when recalled:

"Did Mr. Russell explain what he meant by 'better for you and better for me,' and, if so, how? A. That I would be provided for until his estate was settled. Q. And what by 'better for me'? A. That he would not always have to come to me to get my signature to papers when he bought or sold anything."

There is little need for comment on this testimony. It speaks for itself, and pointedly shows that while, on the one side, the settlement was treated as a matter of wifely confidence, on the other it was approached in the spirit of bargaining, to get as much and give as little as possible, as though the parties were strangers dealing at arm's length. Not only was there no disclosure by Mr. Russell to his intended wife of the nature and extent of his property, or of the part of it to which she could lay claim, but the references made to it were of a character to raise a doubt. The complainant, thus, if not actually misled by direct intention, was at least left entirely in the dark as the result. But worse than this, there was an expression of future inten-

tion which assumed the form of an absolute undertaking by Mr. Russell, as part of the consideration by which the agreement was induced, the subsequent disregard of which was an unpardonable breach of faith. The representation made with regard to the $5,000 which Mrs. Russell was to receive was that it was but a part, and, as she might well be led to infer, a small part, of his intended bounty to her; his express promise being that she should be otherwise liberally provided for after his death by his will. This was given as a reason for reducing the amount originally proposed to be settled upon her, and was enforced by calling attention to the phrase at the end of the agreement, where the matter had been apparently taken care of, "unless some part thereof be given to her by his will." The promise so made, the testator was bound to fulfill, not as a matter of contract, but as one of conscience and good faith. Not only the relation between the parties, but the confidence expressed by the complainant in his assurances, which he himself invoked, forbade anything less. "Can you trust me?" were his words; and her answer, which was most appropriate: "If I cannot, we had better stop right here." How he could bring himself to feel that he had met this obligation by the niggardly gift of 10 shares of bank stock, when he came to make his will, it is difficult to understand.

Entire corroboration of what Mrs. Russell testifies to is to be found in the deposition of her son Grant Brown, taken in the previous case, and introduced as evidence, without further examination on the subject, in this: He states that he was present when Mr. Russell explained the reason for reducing the amount to $5,000, and heard him promise to provide for his mother liberally in his will; declaring that this was merely to meet her temporary needs, and by no means represented the entire share designed for her in his estate. It is not necessary to go over his testimony in detail, or to refer to it further, except to say that upon it alone the complainant's case would be made out, justifying a decree setting aside the agreement on the ground of bad faith.

It is said, however, that fraud cannot be predicated on the mere failure to fulfill an executory promise, for which Marshman v. Conklin, 21 N. J. Eq. 546, and Lovett v. Taylor, 54 N. J. Eq. 311, 34 Atl. 896, are relied on. But that depends. In the first of the cases cited, a trust in lands was sought to be imposed upon a conveyance absolute on its face, by reason of an alleged parol promise made to the grantor at the time to hold for her benefit after the purpose for which the conveyance was executed had been subserved; and it was held that the misplaced confidence involved could not be considered as a fraud or imposition that would avoid the transaction. But the parties stood in no relation of confidence, and dealt at arm's length; and the case set up in the bill was of an express trust resting in parol, in the face of the statute of frauds, which is materially different from the case in hand. In Lovett v. Taylor, an improvident son, acting on the advice of his sister and her husband and their counsel, voluntarily conveyed his property to his mother, who took it for the purpose of preventing it from being squandered. There was evidence of a verbal promise on her part to reconvey to him in course of time, and a reiterated expression of her inten-

tion to do so, but she died without having fulfilled it. On this showing, it was held by the vice chancellor that no trust resulted by virtue of the promise or intention of the mother, nor could any fraud be charged for failure to subsequently recognize the force of the obligation; the promise having been made in good faith at the time, and not falsely or with no intention of ever observing it. Notwithstanding this conclusion, however, the court did, in the end, give relief permitting the son to assert and enforce the trust against his brother and sister by means of a cross-bill.

But without stopping to discuss the merits of these cases, or particularly quarreling with what they immediately decide, there is abundant authority for the position that the failure to regard an assurance upon which an agreement is executed may, under certain circumstances, amount to a fraud. In the leading case of Church v. Ruland, 64 Pa. 432, a daughter importuned and persuaded her father to leave her all his land by will, on the express and reiterated promise that she, in turn, would leave one-half of it to her sister Charlotte's children when she died. Instead of this, she willed it to the youngest daughter; and it was held that the assurance upon which the will of her father in her favor was procured fastened on her conscience, as the party procuring it, a trust or confidence, the failure to fulfill which was a fraud, creating a trust ex maleficio, which a court of equity would enforce. In Cowperthwaite v. First National Bank, 102 Pa. 397, at a sheriff's sale of the land of the plaintiff's husband a promise was made to the plaintiff, his wife, who, by payment of part of the purchase money, had an interest therein distinct from her dower, that, in case she would allow a consentable sale, the execution creditors would buy in the property, and resell it to her on certain terms; and it was held that the subsequent refusal to recognize the arrangement was such a fraud as converted the purchaser into a trustee. In Smithsonian Institute v. Meech, 169 U. S. 398, 18 Sup. Ct. 396, 42 L. Ed. 793, title to land for which the husband furnished the purchase money was taken in the name of the wife on the distinct understanding and promise by parol that she would dispose of it to the Smithsonian Institute by her will. Having failed to do so, a bill was filed after her death to enforce the obligation, and it was held that she was bound thereby. "If Mrs. Avery," says the court, "had during her lifetime conveyed this property to her sister and brothers, it would have been a fraudulent breach of trust; and the like result follows if, now that she has died without executing a will, her heirs are permitted to take the property which was conveyed to her, not as an advancement, but on an agreement that it should subsequently pass to this plaintiff." It is true that in this case a trust resulted from the payment of the purchase money, and the promise was relied on mainly to rebut the presumption of a gift from the husband to his wife; but at the same time the fraud which would follow a breach of the undertaking on which the title was obtained is recognized, which is the importance of it here.

My conclusion on the whole case, therefore, is that the complainant was overreached in the making of the antenuptial agreement, and is entitled to now have it put out of her way. Laying aside all considerations but the last, there is enough in that alone to justify a decree. By

a most definite and assuring promise, that liberal provision should be made for her by the testator in his will, she was induced to part with her dower rights for the very inadequate sum which he persuaded her to accept. The promise so made was more than the expression of a beneficial intention. It was a direct assurance, inviting confidence, and intended so to do, and removed the transaction from the region of ordinary bargaining to that of conscience and good faith. The subsequent breach was a fraud which relates back and vitiates the agreement which was obtained on the strength of it. The testator could not honestly keep the land, in the face of it, free from the complainant's dower; nor can the respondents, his heirs and devisees, who seek to profit by it after his death. To do so abuses the confidence invited and reposed, which a court of equity will not permit.

Let a decree be drawn avoiding the antenuptial agreement, and establishing the complainant's dower in the lands of which the respondents' testator was seised in his lifetime, and appointing commissioners to set off the same, allowing compensation where that cannot conveniently be done as well as for that which has been aliened, and stating an account of the rents and profits meanwhile by way of damages for the detention, with costs.