## HUBBARD v. McMAHON.

### Opinion delivered April 12, 1915.

1. TRUSTS—CONSTRUCTIVE TRUST—PROOF.—A husband engaged actively in business in his wife's name, all of the property being in the wife's name; *held,* under the evidence, that is was the intention of the parties that the wife hold the property in trust for the husband, and that the proof was sufficiently clear and convincing to raise a constructive trust.

2. TRUSTS—CONSTRUCTIVE TRUST—PROOF.—When property is acquired by a husband in the name of his wife, the presumption that the property belongs absolutely to the wife, may be overthrown and a resulting trust established by proof that is clear, satisfactory and convincing, and which leaves no well founded doubt, but that a trust was intended by the parties.

Appeal from Mississippi Chancery Court, Osceola District; *Charles D. Frierson,* Chancellor; affirmed.

STATEMENT BY THE COURT.

Appellee is a grandson of W. F. Hubbard, who died in Mississippi County in the fall of 1913, leaving surviv-

ing him his widow and the following children: Mrs. Hattie McMahon, Mrs. Mays, Mrs. Huggins, Mrs. Dean and Clarence Hubbard, Sr. Mrs. Hattie McMahon was the mother of appellee, and Clarence Hubbard, Sr., was the father of Clarence Hubbard, Jr. Mrs. McMahon died leaving surviving her, as her sole heir at law, the appellee. Clarence Hubbard, Sr., also died, leaving surviving him, as his sole heir at law, Clarence Hubbard, Jr. The mother of the above children of W. F. Hubbard died when they were small, in Iuka, Mississippi, where W. F. Hubbard at that time was residing. About the year 1889 W. F. Hubbard failed in business in Mississippi. Judgments amounting to a large sum were rendered against him and it does not appear from the records that they were satisfied. Hubbard moved to Arkansas and settled in Mississippi County. He brought with him a sawmill and a few oxen. He began operating there a sawmill. Mrs. H. M. Potts came with him from Iuka and established a boarding house, where W. F. Hubbard and some of his employees at the sawmill boarded. Mrs. Potts intermarried with W. F. Hubbard March 3, 1891. After their marriage a large estate was accumulated in Mississippi County, all in the name of Mrs. H. M. Hubbard, the wife of W. F. Hubbard. Soon after the death of W. F. Hubbard, this suit was instituted by the appellee in the chancery court of Mississippi County against Mrs. H. M. Hubbard and the other appellants, the widow and heirs of W. F. Hubbard, deceased, to have a trust declared of the property in the hands of Mrs. H. M. Hubbard in favor of the estate of W. F. Hubbard, deceased, and that appellee be decreed his portion of the estate and that a receiver be appointed to take charge of the property, etc. The appellants answered, denying that the property was held in trust by Mrs. H. M. Hubbard for the estate of W. F. Hubbard, deceased, and alleged that all of the property at the time of the death of W. F. Hubbard belonged to Mrs. H. M. Hubbard.

The court found that "all of the property conveyed to Mrs. H. M. Hubbard after her marriage to W. F. Hubbard was the property of the said W. F. Hubbard at the time of his death and that the said W. F. Hubbard was the owner of all the personal property of every kind and description in his possession and in the possession of Mrs. H. M. Hubbard and claimed by her at the time of the death of W. F. Hubbard and that the said W. F. Hubbard operated and did business under the name of H. M. Hubbard, and that H. M. Hubbard had no right therein except the right of dower and homestead at the time of death of W. F. Hubbard."

The court decreed that the appellee, as the grandson of W. F. Hubbard, was the owner of a fifth interest in all of the property, subject to the dower and homestead rights of Mrs. H. M. Hubbard. Proper orders were entered appointing a receiver to take charge of the property and appointing commissioners for setting aside the homestead and dower of Mrs. H. M. Hubbard. And from the final judgment of the court approving the report of the commissioners disposing of the estate in accord with the above finding this appeal has been duly prosecuted. Other facts will be stated in the opinion.

*J. T. Coston,* for appellant.

1. The agreement on the part of Hubbard with appellant prior to their marriage and their subsequent marriage pursuant thereto afforded a sufficient consideration to support the transfer of the property to her. 96 Ark. 531; 132 S. W. 645; 1 Moore, Fraudulent Conveyances, 325.

2. The first conveyance to Mrs. Hubbard was made March 6, 1891, and the last was on December 18, 1911. A trust resulted at the instant of each conveyance or not at all. 20 Atl. 285; 51 N. E. 153; 36 N. E. 619.

There is no competent evidence in the record to show anything said or done, either by Hubbard or his wife, contemporaneous with the execution of any of the conveyances, showing that it was his intention to reserve a beneficial interest in the property, or her intention to hold it

in trust for him. The proof is that while his wife allowed Hubbard a large discretion in handling the property, her word was final as to all transactions and he always consulted her. But, if it be conceded that he used the property in all respects without restraint or control on her part, the evidence is still wholly insufficient to strike down a deed. 71 Ark. 373; 74 S. W. 517; 1 Pomeroy, Equity, § 1041; 171 S. W. 477; 58 N. E. 237; Kirby's Dig., § 5227; 43 S. W. 275; 115 Ark. 416.

3. Where a husband purchases real estate and takes the title in his wife's name, the law presumes that he intended it as an advancement or gift; and while it is admissible to prove a trust in opposition to a deed, the evidence offered for this purpose must be of such character as to leave no doubt of the fact. 149 S. W. 83; 48 Ark. 173; 104 Ark. 303.

In this case the presumption is not overcome. The proof is that Hubbard did not like the plaintiff, and had said that if he had any property in Arkansas he would disinherit him; had changed an insurance policy some years before his death so as to cut out plaintiff's rights therein, and when appellant took sick he wrote her will in which she gave her husband the use of the property for life and at his death it was to go to Clarence Hubbard, Jr., and the three surviving daughters, thus cutting out the plaintiff. 66 Atl. 190; 47 N. E. 432; 86 Atl. 406; 103 N. E. 194. See also 58 Pac. 544; 16 Atl. 325; 142 S. W. 925; 50 Pac. 471; 100 S. W. 583.

The execution of the will at Hubbard's request, the writing of it by him, and the conveyance of several tracts of land to appellant afterward, evidence the fact that they both understood that the property belonged to her and not to Hubbard, and that in case she died without a will he and his children would not get the property. 116 S. W. 192; 89 Ark. 187.

*Lamb & Rhodes* and *Stone & Son,* for appellee.

1. The presumption that where a husband buys real estate and takes the title in his wife's name he intended it as an advancement or gift is not conclusive. It may be

rebutted by antecedent or contemporaneous declarations and circumstances which tend to prove the intention of the husband that the grantee should hold as a trustee and not beneficially for herself. 40 Ark. 62.

All the facts and circumstances developed in the evidence, Hubbard's financial embarrassment when he left Mississippi, his having a family of children by a former marriage and none by the second, his merging his business identity into that of H. M. Hubbard, his transacting all business in all respects as his own, the making of the will and Mrs. Hubbard's own admissions that she intended to give certain of his children all of his real estate, lead to the one conclusion that they both understood that the property was his, and that she recognized the trust relationship in which she stood. The evidence is so clear, convincing and conclusive that the chancellor could not have found otherwise. 58 N. E. 237, and cases cited; 66 Ala. 55; 44 Vt. 555; 25 Ia. 43; 169 U. S. 398; 67 Neb. 548; 23 Vt. 638.

Trusts of this nature are taken out of the statute of frauds and may be proved by parol, the evidence, of course, to be full, clear and convincing. 41 S. W. 845; 84 S. W. 491; 88 S. W. 999; *Id.* 949; *Id.* 573; 96 S. W. 175; 102 S. W. 228; 74 S. W. 516; 151 S. W. 284; 149 S. W. 80; 146 S. W. 867; 117 S. W. 747.

In all cases the courts look to the intention of the parties as shown by acts and circumstances in determining whether a trust resulted from the transaction. *Supra;* 42 S. E. 547; 23 Atl. 57; 102 N. W. 774; 72 N. W. 771.

2. It is well settled that the chancellor's findings of facts are conclusive unless clearly contrary to the preponderance of the evidence. 168 S. W. 616; 166 S. W. 740; *Id.* 636; 165 S. W. 457; *Id.* 269; 113 Ark. 19; 112 Ark. 134, and many other Arkansas cases.

WOOD, J., (after stating the facts). After the marriage of W. F. Hubbard (who will hereafter be designated as Hubbard) to Mrs. H. M. Potts (who will hereafter be designated as Mrs. Hubbard), real estate was

accumulated in the name of Mrs. Hubbard in Mississippi County, Arkansas, that was appraised at $40,180, as shown by the report of the commissioners appointed to set apart her dower and homestead.

Mrs. Hubbard testified that Hubbard was running a store at Iuka, Mississippi, before he came to this country, and that he turned the store over to a clerk named Jordan and the clerk broke him. "That was why he left there." In explanation of why the real estate was taken in her name, she says: "When he (Hubbard) got the telegram from Jordan that his store was closed, of course I got dissatisfied and packed my trunk to go away. He said: 'Now, if you will stay here and marry me, I will marry you, and what we accumulate in this bottom will be yours.'" When asked if there was any consideration for her marriage to Hubbard other than simple love and affection, she answered: "He told me if I would marry him everything he made in Arkansas would be mine." She further stated that his proposition was accepted by her. In response to the question why all of the deeds were taken in her name instead of Hubbard's, she answered: "Because I would not live in Arkansas except everything was in my name." She also stated that at that time she was engaged to Hubbard, expected to marry him, and when the telegram came telling of the failure of his business in Mississippi she became dissatisfied. The shutting down of the mill would have taken away her boarders, and she made up her mind to leave. She knew that when she went away Hubbard would have gone, too. She says: "I expected him to be mine some time, and I did not want to have a broke man." In regard to the understanding between herself and Hubbard concerning the acquisition of the property, the record shows the following:

Q. It is a fact that practically all during the married life with Mr. Hubbard, and when you were accumulating that property there, that it was with the under-

standing that at your death it was to be his property absolutely, and your will provided that?

A. I do not know as it read that way.

Q. That was the meaning of it?

A. It was to be divided among the children that stuck to him—the children were to have a certain part of it.

Q. If you died before he did?

A. Yes, sir.

Q. If you died before Mr. Hubbard, then it was to go to the children?

A. No; he was to have his part of it and a living.

Q. A life interest?

A. Life interest, of course.

Q. Then it was to go to his children?

A. Not to his children, certain ones of his children.

Mrs. Hubbard was asked: "Do you know of any writing made by him regarding the distribution of any property that he was interested in?" and answered: "Nothing but my will that he wrote for me." She further testified in regard to this will that in it she made a provision by which she gave Hubbard all of the property, and states that "it was drawn by an understanding and agreement with Mr. Hubbard." (This instrument purporting to be Mrs. Hubbard's will, although not signed by her, was confessed by her to be her will. It was in evidence and disposed of all her estate real and personal equally among the heirs of Hubbard, omitting appellee. The instrument provided that Hubbard was to have control of all of the property during his life applying the rents and increase "as he may deem necessary for his support," and giving him the right to sell any part of the property and apply the same to his support. Hubbard was appointed guardian of the minor, Clarence Hubbard, and was made executor of the will without bond.) Mrs. Hubbard further testified that Hubbard conducted the business as he thought best, that he was a very successful business man; that the only property that he ever

helped to accumulate was the property that appeared in her name. The business was conducted "just as other husbands and wives conduct their business." He used his own judgment in buying and selling, but was "like all other men with their wives, he always asked if it was agreeable. When I said no, no went, and yes went in any kind of trade." At another point in her testimony, she stated: "He generally always asked me what I thought about it, and my answer would be, "Do just what you like about it, whatever you think is right.' So far as I know, he acted on his own judgment." She was asked if she told her husband at the time he drew the will how she wanted the property divided, or if he divided it to suit himself, and she answered: "We talked it over, he and I together." She was asked why she gave all that property to Hubbard's children without any provision for her own relatives, and she answered that she made such provision because she thought more of Hubbard's children than of her own people. In this connection are the following questions and answers:

Q. You also consider that Hubbard, who created that property, had an interest in it?

A. Why, certainly.

Q. And that he had a right to say where it should go?

A. No, no; he had no right only as I said.

(1)    The above are the material portions of Mrs. Hubbard's testimony, and, taking it all together, and in connection with the other facts adduced in evidence (which it is unnecessary to set out in detail) we are convinced that, at the time the property in controversy was acquired and the deeds to the real estate were taken in the name of Mrs. Hubbard, it was the intention of Hubbard, and also Mrs. Hubbard, that the latter should hold the same in trust for Hubbard. In other words, the record discovers full, clear and convincing proof of a resulting trust in favor of Hubbard, and the chancellor was correct in so holding.

Soon after Hubbard came to Arkansas, his business that he had left in Mississippi "went to pieces." Judgments in large sums were obtained against him. His property was attached and sold. True, there was oral testimony tending to show that these judgments were afterward paid off, but the records do not show that they were satisfied. The records show that there was a fine entered against Hubbard and they do not show that this fine was paid. The records further show that Hubbard was on a bail bond in Mississippi for $1,000 that had been forfeited. These facts are wholly immaterial further than that they tend to show an unsuccessful business career in Mississippi and that this experience of financial embarrassment there possibly accounts for the motive that actuated him, after he began business in Arkansas, to acquire all of his property and transact all of his business in the name of his wife, Mrs. Hubbard. But whatever may have been his motive, the fact is as shown by the uncontroverted evidence, that soon after Hubbard came to Arkansas, and after his intermarriage with Mrs. Hubbard, he transacted all of his business and acquired all of his property, both real and personal, in her name. To the commercial and business world, he lost his identity completely. He was known in all his business transactions as H. M. Hubbard. He even paid his poll tax under the name of H. M. Hubbard. He had four girls and one boy by his first wife. Some of these were minors. He had no children by Mrs. Hubbard, the appellant. Mrs. Hubbard had three sisters. The testimony of Mrs. Hubbard shows that Hubbard was a good business man, and the large and valuable estate he had accumulated is evidence of his frugality and business acumen.

If, as appellants contend, this large estate was acquired with the intention upon the part of Hubbard that it should be the sole and separate property of Mrs. Hubbard, then at the death of Mrs. Hubbard, intestate, the property would have belonged to her sisters. If her death had occurred prior to the death of Hubbard, under such a disposition, he would have been wholly denuded of

his property, and, as a consequence, those of his children who were dependent upon him would have had nothing. As a sensible business man, Hubbard must have known that the dower and homestead rights of Mrs. Hubbard in his estate (assuming that the property was his) would have amply provided for her every comfort necessary, and even every luxury she might desire.

Mrs. Hubbard seems to have been impressed with the idea that Hubbard, before their intermarriage, was so enamored of her that he would have abandoned all to follow, and be with, her wherever she might go. But even if before marriage there was the all-impelling infatuation for her that would have moved him to go anywhere in order to have her companionship, there is nothing in this record to justify the conclusion that after their marriage he was under any such strange delusion of love or fancy for Mrs. Hubbard that caused him to forget himself and his own offspring while he was accumulating the property in controversy. It is inconceivable that he would have acquired this large estate in the name of his wife, and with the intention that the same should be her sole and separate property, and by this arrangement render himself a pauper in case of her death, intestate. The motive of self-preservation, so to speak, and the natural impulses of love for, and duty toward, his children render it entirely unreasonable that he would have accumulated all this property and vested the absolute title thereto in Mrs. Hubbard.

Therefore, we are of the opinion that the effect of Mrs. Hubbard's testimony, when considered as a whole, is that the property in controversy was accumulated by Hubbard and the title placed in her name with the understanding at the time this was done that the property really belonged to her husband.

The will, when taken in connection with the testimony of Mrs. Hubbard, showing why it was made, is a very cogent fact in establishing that it was the intention of Hubbard and Mrs. Hubbard that the property should be held in her name, but in trust only, and that the real bene-

ficial interest was in Hubbard. For she says: "I don't know of any will that my husband made except the one he wrote for me;" thus showing that she recognized that her husband really had the power to absolutely dispose of the property. Again, she says she made a provision by which she gave Hubbard all the property, and that the will was to be drawn "by an understanding with Mr. Hubbard."

After the death of Hubbard, when she began to make disposition of the property, she ignored the appellee. The reason she assigns for not awarding to appellee the interest that belonged to him as the sole heir of Mrs. McMahon is that "he never did own Mr. Hubbard as his grandfather; never called him grandfather." She says: "He never wrote his grandfather but one letter in his life that I know of, and then called him Mr. Hubbard, and signed his name, 'Your friend, W. B. McMahon.' " She says the letter was lost, but in further explanation of its contents she stated that it read, "Will you please loan me $500 to complete my education as a dentist?" and signed it, "From your friend, W. B. McMahon." She stated that Hubbard, when he received the letter, turned around and said: "If I ever get to own anything in Arkansas I intend to disinherit him."

This testimony in regard to the contents of the letter that appellee wrote to his grandfather was specifically denied by the appellee. Appellee, while admitting that he wrote his grandfather letters, stated that he always addressed him as "Dear Grandfather." He stated that he did not ask him to loan him any money and did not sign any of his letters, "From your friend, W. B. McMahon."

The father of appellee testified that he was a dentist and in reasonably prosperous circumstances; that he did not need any "financial help to raise and educate his son;" that he educated his son at the University of Mississippi and Vanderbilt, paying the expenses himself.

The testimony of Mrs. Hubbard in regard to this purported letter is so unreasonable that we do not think it is worthy of credit. That a youth attending college, in writing a letter to his grandfather for the purpose of securing a loan to enable him to finish his education, would address his grandfather as "Mister" and sign the letter "From your friend, Walter McMahon," seems to us so utterly incredible that we can not accept it over the positive testimony of the young man himself and of his father, showing that the most cordial relations existed between them and the grandfather, and that there was no reason why the grandson should not have addressed his grandfather in the usual natural language of endearment in which such letters are couched. It is most natural that a grandson who desired to borrow money from his grandfather would seek not to offend him by ignoring the close tie of kinship. The purpose of his letter on the contrary being to borrow money it seems but reasonable that he would recognize and seek to emphasize the relationship, rather than manifest an indifference to it.

The only effect of this testimony is to show that Mrs. Hubbard, in this particular, failed to recognize and carry out the trust that was reposed in her by her husband. But even for this conduct on her part she assigns as an excuse the desire to carry out what she says was her husband's express wish before his death in regard to, the disposition of the property so far as appellee was concerned.

We can not believe upon such testimony that Hubbard ever expressed a wish to disinherit his grandson, and since Mrs. Hubbard realized her obligation to conform to his wishes as to his other heirs, in justice to appellee she should also have awarded him his portion of Hubbard's estate.

Taking the testimony of Mrs. Hubbard as a whole, it alone furnishes full, clear and convincing proof that when Hubbard accumulated the estate in controversy in

her name and had the title to the real property described in the complaint taken in her name, he did not intend the same as a gift or advancement to her, but, on the contrary, only intended that she should hold the same in trust for him.

The law applicable to the facts of this record has been often declared by this court. The facts do not call for the announcement of any new principle.

In *Milner* v. *Freeman,* 40 Ark. 62, it is held that in equity, where a husband purchases real estate and pays the purchase money, but takes the title in the name of his wife, the presumption is that the transaction was an advancement or gift. But such presumption is not conclusive, and may be rebutted by antecedent or contemporaneous declarations or circumstances tending to prove that it was the intention that the wife as grantee should hold the property, not absolutely, but in trust for the benefit of her husband; that the husband as the *cestui que trust* is not estopped by the recitals or covenants in the deed from proving by parol all the facts from which a trust may be inferred. These principles have often been reiterated. See *Camden* v. *Bennett,* 64 Ark. 155; *Chambers* v. *Michael,* 71 Ark. 373; *Poole* v. *Oliver,* 89 Ark. 578; *Della* v. *Della,* 98 Ark. 540; *Harbour* v. *Harbour,* 103 Ark. 273; *Keith* v. *Wheeler,* 105 Ark. 318.

The above principles are so well established by the decisions of our own court that we are not called upon to go beyond these. But an excellent statement of the same doctrine is contained in One Perry on Trusts, section 147, which is cited and quoted with approval in *Smithsonian Institution* v. *Meech,* 169 U. S. 398-407.

(2.) The fact that the property in controversy was acquired by Hubbard in the name of Mrs. Hubbard, and that the title to the real estate was taken in her name, create a strong presumption of a gift or advancement and that the deeds are what they purport to be. But this presumption, as we have seen, is not conclusive. We have often ruled that under such circumstances, the proof to overcome the presumption of a gift and to establish a

resulting trust must be clear, satisfactory and convincing. It must be such as to leave no well founded doubt that a trust was intended. *Keith* v. *Wheeler, supra; Hall* v. *Cox,* 104 Ark. 303; *Mason* v. *Harkins,* 82 Ark. 569; *Foster* v. *Beidler,* 79 Ark. 418; *Tillar* v. *Henry,* 75 Ark. 446.

In arriving at the intention of Hubbard and Mrs. Hubbard, we have carefully considered all of the testimony in the record. As to whether or not it was their mutual intention that the property in controversy should be acquired in her name, but, held by her in trust for Hubbard, was purely a question of fact, and it could serve no useful purpose to further discuss the evidence in detail. In suffices to say that it measures up to the requirements of the law as to the character of proof necessary to establish that such was their intention. Upon being thus established the law declares a resulting trust.

While the deeds recite that the consideration was paid by the grantee, Mrs. Hubbard, and while Mrs. Hubbard, in regard to the purchase of the tract of land from Goodwin, in answer to the direct question, stated that she paid $1,000 named as the consideration in the deed, yet when asked how she earned it she stated that she "cooked, milked, raised hogs, cattle of all descriptions, chickens."

In regard to a tract purchased from Geo. W. Shroyer, she stated that the cash payment of $500 was made by Hubbard, and that the balance of the purchase money was borrowed. She says, "We made notes and paid the notes."

Appellants contend that this testimony shows that the purchase money for these tracts of land was not furnished by Hubbard. These isolated portions of Mrs. Hubbard's testimony would tend to sustain their contention. But when all of her testimony is considered together, and when the testimony of the other witnesses is considered, it is clear to our minds that Hubbard managed all the business; that Mrs. Hubbard had no separate business of her own and that she did not transact any of the business by which the property in controversy was

acquired. We have set forth enough of her testimony to show that the business of accumulating the property was conducted by Hubbard, and not Mrs. Hubbard. For instance, at one place in her testimony, in answer to a question as to why he took all of the deeds in her name, she says: "Because I would not live in Arkansas except everything was in my name." In another place, speaking of the business, in answer to a question, she stated that "it was conducted, so far as she could tell, just the way other husbands and wives conduct their business."

A business man in Memphis, with whom Hubbard had extensive business transactions, and who was the draftsman of three of the deeds to lands that were taken in Mrs. Hubbard's name, testified that Hubbard transacted all the business "with the same freedom and authority as if he was absolute owner of everything."

The testimony of other witnesses as to Hubbard's declarations at the time they were engaged in business transactions with him shows clearly that while he was conducting his business in the name of his wife, he asserted that all the property acquired in her name belonged to him. These were declarations made in the course of the transaction of business at the time and prior to the acquisition of the property in controversy, and made this testimony competent under the doctrine announced above in *Millner* v. *Freeman* and *Smithsonian Institution* v. *Meech.*

There is no doubt that Mrs. Hubbard performed faithfully such duties as she described and such as thousands of industrious and loyal housewives are daily performing in their domestic relations with their husbands. And there is no doubt that the relation between herself and husband, as she expresses it, was "just the way other husbands and wives conduct their business." But there is no proof, as we view the whole record, to justify the conclusion that she in any way managed the business by which the property belonging to the estate of Hubbard was accumulated. She discharged her duties nobly as a

loyal wife, and, of course, in this way, by industry and economy, she doubtless greatly assisted her husband to become the successful financier and business man that the record shows him to have been. But to say that she managed the business and furnished the purchase money which enabled Hubbard to accumulate the snug fortune disclosed by this record would be wholly at variance with the true state of the case.

The testimony of Mrs. Hubbard to the effect that Hubbard said to her, "Now, if you will stay here and marry me, I will marry you and what we accumulate in this bottom will be yours," and that she accepted his proposition; that she "would not live in Arkansas," etc., unless all the property was taken in her name, is not sufficient to establish an antenuptial contract for the conveyance of real estate and personal property which at that time had not been acquired by Hubbard. The testimony is too indefinite to show a marriage contract.

The findings of the chancery court are in all things correct, and the decree is therefore affirmed.

McCulloch, C. J., and Kirby, J., (Dissenting). We think that the majority of the court have failed to give proper effect to the testimony as set forth in the opinion; and have disregarded well-settled rules concerning the presumption arising from the act of a husband in conveying property or causing it to be conveyed to his wife, and the degree of proof necessary to establish a resulting trust. There is, we think, no proof at all tending to overcome the legal presumption that the conveyances to Mrs. Hubbard were intended as a gift. Every act of the parties is, according to our view, consistent with the idea that a gift was intended, and there are no facts or circumstances proved which are inconsistent with that intention.