**LEWIS, Plaintiff, v. AKERBERG, Defendant.**

Common Pleas Court, Franklin County.

No. 183414.   Decided May 12, 1953.

Eagleson & Eagleson, Columbus, for plaintiff.
Dalton R. Kincaid, Barton Griffith, Jr., Columbus, for defendant.

**OPINION**

By BARTLETT, J.

The Court finds that the plaintiff and her mother in 1920 furnished the purchase price of $15,000 for the 19 acre tract described in the petition and known as 6856 N. High Street, Columbus, Ohio; that the title thereto was taken in the name of plaintiff's father, and the premises were purchased as a home for plaintiff's parents, her brother and herself; that in 1921 the father conveyed said premises to the mother by deed of gift; that in 1943 the mother gave the son a mortgage for $7000.00 on the premises for money advanced the mother, including $4451.81 to pay off a mortgage placed thereon by the parents; that on August 8, 1946, the mother conveyed said premises to the son by deed of gift, and the deed was recorded May 28, 1949; that from time to time the son advanced certain money for the maintenance and support of the father and mother who died in 1942 and 1951 respectively, and both parents lived on the premises until their death; and that the plaintiff had no knowledge of the $7000.00 mortgage until after the death of the mother and no knowledge of the deed to her brother until January, 1950.

Held as follows:

1. The plaintiff and her mother at the time of its purchase, took the equitable estate in the premises as tenants in common, in the proportions by which they furnished the purchase price thereof, being a 2/5ths equitable interest owned by plaintiff.

2. The mother and brother by their respective deeds of gift, held the legal title to the 2/5ths undivided estate in fee simple in said premises in trust for the benefit of the plaintiff.

3. The deed to the brother was given as security for advances made for the maintenance and support of the mother, and for that purpose must be treated as an equitable mortgage.

4. The $4415.81 advanced by the brother to pay off the mortgage given by the parents, is an equitable lien on the entire premises, but the other undivided interest therein must be exhausted before resort may be had to plaintiff's interest therein, to satisfy said advancement.

All other advances by the brother must be satisfied out of the other undivided interest in the premises, as the interest of the plaintiff is not liable for said advances.

5. The court will take judicial notice, as part of the history of the country, that the present value of the premises exceeds by far its value in 1920; and the court is satisfied that the value of the other undivided interest in the premises will be much more than sufficient to satisfy in full the total claims of the brother for said advances and, consequently, the in-

terest of the plaintiff in said premises will not be subject to said advances.

6. The court, therefore, orders the defendant Herbert Akerberg to convey to the plaintiff Vivian Akerberg Lewis the legal title to an undivided 2/5ths interest in fee simple in the premises described in the petition; and in the event the conveyance is not made by the defendant within thirty days from the entry of the decree herein, said decree itself shall act as such conveyance.

Vivian Akerberg Lewis brings this action against her only brother, Herbert V. Akerberg, seeking a decree finding her to be the owner in fee simple of an undivided 2/5ths interest in a tract of about 19 acres, on the west side of North High Street, south of Worthington, the title to said premises being held by her brother under a Quit Claim Deed, absolute on its face, from his mother; and that her brother be required to convey to her said 2/5ths interest, free from any and all claims of her said brother. The premises are also known as 6856 North High Street.

Mrs. Lewis sets forth in her petition that prior to July 15, 1920, she entered into an oral agreement with her father and mother that they would purchase a tract of real estate to be used as the family home during the life of her parents; that she should own an undivided interest in said premises in proportion to the part of the purchase price furnished by her; that the title to the premises was to be taken in the name of her father, Mathias Akerberg; and that if the premises were sold during the life of her said parents or either of them, plaintiff should receive her respective share of the proceeds of said sale.

Mrs. Lewis further states in her petition that pursuant to said agreement she and her parents purchased the aforesaid premises for the sum of $15,000.00 from Belle Cleveland and others; that the title thereto was taken in the name of her father by a deed dated July 15, 1920; that the plaintiff paid $6,000.00 as her portion of said purchase price; that plaintiff's mother and her brother, at the time of said purchase, had full knowledge of the terms of said agreement and the portion of the purchase price paid by her; that on March 17, 1921, her father conveyed said premises to her mother, Mary D. Akerberg, by a deed of gift; that her father died December 22, 1942; that her father and mother respectively, held title to the 2/5ths interest in the premises as her trustee; that without her knowledge or consent, on August 8, 1946, her mother conveyed the premises to her brother by a Quit Claim Deed of gift; that her brother did not file said last mentioned deed for record until May 28, 1949; that she first learned of the

conveyance of said premises to her brother in January, 1950; that her mother died February 11, 1951; and that by virtue of the facts well known to her brother, he held title to the 2/5ths undivided interest in the premises as her trustee, but that her brother now claims to own the entire estate in said' premises and denies she has any interest therein.

On October 29, 1951, Herbert Akerberg filed his answer, admitting Mrs. Lewis was the daughter of Mathias and Mary D. Akerberg, who died on the dates set forth in her petition, and that she is his sister; that the premises were conveyed to the respective parents and to himself as stated in her petition; but denies all other claims of Mrs. Lewis.

The case came on for trial February 24th last, at which time Herbert Akerberg tendered a new answer which at first the Court refused to permit being filed, but at the close of the plaintiff's case, the Court permitted the new answer to be filed in order to further explore the facts in the case.

The new answer sets forth the same facts and denials as the previous answer; and in addition, denies the trust agreement set up in the petition, but states if plaintiff ever had any interest in the premises, the same is barred by the statute of limitations; that plaintiff is estopped to claim any interest therein, and is guilty of laches in asserting her claim; that during the life of both parents she did not assert any claim therein, and that defendant upon the faith and security of his mother's title to the premises, advanced monies to both his father and mother from 1933 to the death of his mother in the sum of $      ; that the defendant in 1943, paid $4415.81 to the Ohio State Federal Savings and Loan Association in discharge of a mortgage on the premises given by his parents and became subrogated to the rights of said association, and, on account of said advance of $4415.81 and other advances, he received from his mother a note and mortgage for $7000.00 on said premises; that prior to August 8, 1946, defendant in addition paid to his parents for their maintenance and support, the sum of $11,190.19, and on said date, for said considerations his mother conveyed the premises to the defendant, and as a further consideration therefor, defendant agreed to pay for the support of his mother such sums of money as she needed, and did thereafter so pay $5581.32; and that said sums of money were advanced by the defendant and said mortgage received by him, without knowledge of any claim against the premises by his sister.

The evidence at the trial showed that Mathias Akerberg in 1920, was a blacksmith with the Pennsylvania Railroad, living in a modest home at 132 Midland Avenue, Columbus, Ohio, with his wife, Mary D. Akerberg, his daughter Vivian and his

son Herbert. Mathias earned about $7.60 per day; Vivian went to work at 15 years of age, finally as secretary and bookkeeper, and Herbert then 23 years of age, worked for the Massie-Harris Harvester Company and the Ford Motor Company. In 1928 Herbert moved to New York and became affiliated with the Columbia Broadcasting Company and finally became its Vice-President in charge of the television network.

In 1920 the Akerberg family moved from Midland Avenue to the new home on the 19 acre tract on the west side of North High Street, south of Worthington.

Vivian called Herman Johnson, a real estate dealer, about the sale of the North High Street property (R. 11). Thereafter, May 4, 1920, Mathias and his wife signed a contract to purchase the 19 acre tract for $15,000.00 from Belle Cleveland and others.

The exhibits show that on April 20, 1920, Vivian deposited $7915.00 in her checking account and on the same date she withdrew by check $7000.00, which she deposited the same day in her father's savings account at the Ohio State Savings Association; the balance on the father's account was $35.50 at the time Vivian deposited the $7000.00.

On June 24, 1920, the Akerberg family sold the Midland Avenue home for $5900.00, the title being in the name of Mary D. Akerberg. She received from the purchaser Frank M. Dye $1000.00 cash and two mortgages for $3500.00 and $1400.00 respectively; and on the same day the $1000.00 cash was deposited in the savings account of her husband at said Savings Association, being the next deposit after the $7000.00 deposit therein by Vivian.

At the time of signing the contract to purchase the 19 acres, Mathias gave Herman Johnson a check for $500.00 on said Savings Association to apply on the purchase price thereof. On July 15, 1920, Mathias received a deed from Belle Cleveland and others, for which he gave Belle Cleveland a check from the savings association for $3447.52, being the balance of a $3500.00 purchase mortgage of said date on said premises given by Mathias and wife to said association, the $500.00 check dated May 7, 1920, held by Herman Johnson, the $3500.00 mortgage from Dye on the Midland Avenue property, a $1400.00 second mortgage on the 19 acres, a $34.28 check, cash $104.70, and a check from said association for $6000.00—which, with the $12.50 revenue stamp and $1.00 for recording the mortgage, made the total $15,000 purchase price of the premises.

On June 17, 1920, Mathias gave a $634.92 check on said association to pay off the mortgage on the Midland Avenue property and on June 24, 1920, he gave such a check for $177.00

to Harry G. Butler, as a broker fee on the sale of the Midland Avenue property, and on July 13, 1920, Mathias gave Vivian a similar check for $723.58.

On July 24, 1920, when the $6000 check was drawn to Mathias by the association and turned over to Belle Cleveland, it left a balance of $18.13 in his savings account. On p. 14 of the record the real estate dealer, Herman Johnson, testified: "This deal had some things in it you wouldn't know until it was actually closed on the last day"; and plaintiff's Exhibit 5 prepared by Johnson bears this out.

At no time during the trial did the defendant state that he had no knowledge that his sister had furnished part of the purchase money.

There can be no question that the mother knew how the purchase money was obtained to buy the 19 acre tract. $1000.00 of the sale price of the Midland Avenue property was placed in the Savings account of her husband. The mother was present when the purchase of the premises was closed. She signed the $3500.00 purchase money mortgage to the Savings Association. She signed the $1400.00 second purchase money mortgage to Belle Cleveland, and she assigned the $3500.00 mortgage on the Midland Avenue property to Belle Cleveland as part of the purchase price of the 19 acre tract.

Mrs. Lewis was very much limited as to her testimony, by virtue of §11495 GC, since her brother was claiming title under the deed from his mother who had since died. Nevertheless, the exhibits go together as perfectly as any jig saw puzzle ever worked out. With the testimony of Herman Johnson the real estate dealer who closed the deal for the 19 acres, as well as the testimony of the Teller from the Ohio National Bank and the two representatives of the Savings Association, the evidence is clear and convincing that Vivian Akerberg furnished $6000.00 of the $15,000.00 purchase price of the 19 acres in dispute.

The Court feels that there is sufficient evidence to sustain the allegations of plaintiff's petition that the title to the 19 acres was conveyed to her father under an express trust agreement, but in view of the undisputed evidence as to how the purchase price was furnished, proof of an express trust was not necessary to the plaintiff's case.

"Where a purchase is made with money belonging to a child and the legal title taken in the name of the parent * * * the presumption is that the title is so taken in trust, for the benefit of the child; and the burden is on the holder of the legal title to overcome that presumption. It is true, that where the consideration is furnished by two or more persons, the

share advanced by each must be a definitely ascertainable aliquot part in order to raise a trust **pro tanto**; but we perceive no difficulty in the application of that rule in this case."

Williams, J., in the case of **Roberts v. Remy, et al., 56 Oh St 249, 256,** also syllabus 2 thereof; Pomeroy's Equity, Sections 1037, 1038; **40 O. Jur., Trusts, pages 275-278;** 54 Am. Jur. Trusts, Sec. 194, 195; Scott on Trusts Vol. 3 Sec. 440; **Paschall v. Hinderer, 28 Oh St 568.**

"An express agreement to the same effect as a Resulting Trust does not preclude the existence of the Resulting Trust, where the essential elements of a Resulting Trust are present (citing 169 U. S. 398), and the fact that the one seeking recovery of property founds his claims on an express trust, and disclaims a Resulting Trust, does not prevent the Court from treating it as the latter if it is such a fact." 4 Am. Jur. Trusts, Sec. 195.

Where the wife pays and the title is taken in the name of the husband, the same presumption of a resulting trust arises, as where the consideration is furnished by the child and title is lodged in the parent. **40 O. Jur., Trusts, pg. 279, Sec. 100.** Consequently, the mother and daughter in the instant case were exactly in the same position, each being the equitable owner of an undivided portion of said premises to the extent of their contribution to the purchase price, with the legal title in their husband and father.

The conveyance of the premises by deed of gift to the mother was consistent with the trust and in no sense adverse, and cannot be treated as a repudiation of said trust relation or a denial of the right of the cestui que trust, unless the beneficiary has knowledge that a repudiation was intended. 3 Scott on Trusts, Sec. 109.

"The conduct of the trustee must have amounted to an open repudiation; a mere technical breach * * * without other circumstances indicating a position adverse to the trust, would not destroy the continuity of the latter. This would be especially true if the trustee and the beneficiary were near relatives, as when the former stood in loco parentis to the latter, for in such cases, the presumption would be against the repudiation of the trust." **16 O. Jur., Equity, p. 122.**

The Statute of Limitations could only begin to run after such intended repudiation was known to the beneficiary, **16 O. Jur., Equity, p. 278.**

"Laches may be a bar, but in the case of a beneficiary under a **resulting trust,** he is not barred by **mere lapse of time.** He is barred only if the trustee repudiates the trust to his knowl-

edge and he thereafter takes no proceeding against the transferee for so long a time that it is **unequitable** to permit him to enforce the trust." 3 Scott on Trusts, Sec. 409.

The defendant in his new answer and in the trial called attention to certain mortgages placed on the premises by the father and mother, and claimed they constituted breaches in derogation of the alleged trust. It must be remembered that two purchase money mortgages were placed on the premises at the time of purchase, and the subsequent mortgages would appear to be merely means of refinancing in order to secure more favorable interest rates and time and amount of payments; and in any event, the placing of such mortgages on the premises was not brought to the notice of the daughter, as far as the evidence shows.

The defendant alleges estoppel to claim any interest on the part of plaintiff. Estoppel to be available to the defendant, must be based on a showing that he has been innocently misled into an injurious change of position, by some act or representation of his sister. **16 O. Jur. Estoppel, Sec. 34, p. 586.** No such showing has been made in the instant case.

The defendant in his answer filed at the trial, alleges that he advanced certain moneys to his parents, from time to time, from 1933 to the death of his mother, upon the faith and security of the mother's title to the premises. No citation of authority is necessary, to sustain the principle that a deed absolute, in equity will be treated as in the nature of a mortgage only, if justice and equality so require, where the evidence discloses that the deed was taken as security for the payment of money advanced. **Wilson v. Giddings, 28 Oh St 554; Fleming v. Minx, 4 Oh Ap 406.**

The defendant in his last answer alleges that in 1943 he paid $4415.81 in discharge of a valid mortgage on the premises, and thereby became subrogated to the rights of the mortgagor. The evidence bears out this claim. Equity would require that he resort to and exhaust the other 3/5ths interest in the premises, before the 2/5ths interest of his sister, be subjected to said claim. **26 O. Jur. Marshaling Assets, Sec. 2, p. 99.** The balance of the $7000.00 note and mortgage received by the defendant, must be taken solely from the other 3/5ths interest and his sister's 2/5ths interest is not liable therefor.

The defendant alleges that his mother conveyed the premises to him in consideration of the monies previously advanced to his father and mother for their maintenance and support, and the further consideration of his promise to pay such monies as were necessary for her future support and that he did thereafter in fact, pay from time to time for her support

the sum of $5581.32. Certainly the record discloses no evidence to sustain any claim that the deed was delivered pursuant to any such agreement with his mother. In fact, the defendant did not even attempt to testify to any such agreement.

"Where a party to an action offers himself as a witness, but is not asked to testify concerning a matter of importance to himself in such action, the presumption is that he was not inquired of concerning such matter because his answers would have been unfavorable to him." **Grant v. Pittsburg and W. R. Co.,** 10 C. C. 362, affirmed **54 Oh St 660.**

The Court is convinced that the deed from his mother must be considered in equity as in the nature of a mortgage to secure moneys advanced from time to time by the defendant to his mother; and that the defendant must look to the other 3/5ths interest to satisfy said advances, since the 2/5ths interest of the plaintiff is not liable for said advances secured by the deed.

The defendant identified many checks which he said were for advances to support his father and mother. He also identified a cognovit note, Exhibit 190, dated July 26, 1945, signed by his mother and payable to himself in the sum of $1000.00 (R. 119). When the Court asked the witness if the note covered expenses shown by his previous checks, his counsel said "No," but the defendant admitted the note did cover such advances shown by his previous checks but he didn't know how many. The defendant also admitted the same thing was true with reference to the $7000.00 note and mortgage. (R. 120.)

The defendant thus shows he knew how to secure his advances by a mortgage on the premises, and, he must be considered as having agreed with his mother at that time on the amount due him, and for which he looked to said promises for security. In other words, his claims were liquidated when the amount due was ascertained. 1 Cyc. 334; 25 Cys. 1444. Any collateral benefit received by the payee (such as specific security) which might raise a technical legal consideration, although apparently it was less than the amount due, constitutes full satisfaction. Brooks v. White, 2 Met. 285, cited with approval in **Harper v. Graham, 20 Ohio, 105, 115.** The note and mortgage transaction is in the nature of an accord and satisfaction on account stated.

"It has been too often decided to be an open question that where such a dispute exists, and one party to the dispute tenders an amount in full settlement of the entire claim and it is accepted and a receipt given in full by the opposite party, that this constitutes an accord and satisfaction, and that the

party thus receipting will not be allowed afterward to litigate about the matter—the law favors the voluntary settlement of disputes." Coal Co. v. Sunday Creek Co. 12 N. P. (N. S.) 641, 645; Seeds Grain and Hay Co. v. Conger, 83 Oh St 169.

The mother who gave the mortgage being dead and defendant admitting that the mortgage covers advances made by previous checks, but he didn't know how many, the defendant should not be permitted to question the settlement contained in the mortgage. He is on strict proof in the instant case.

The defendant admits (R. 126) he did not tell his sister when he paid off the balance on the mortgage on the premises. He doesn't know whether he or the mother later told his sister he had paid it off (R. 126); but plaintiff says he told her about paying off the mortgage in 1944 when she was in New York (R. 146 and 148), at the time he received a telephone call from their mother, and his sister says this was her first knowledge that he had paid the mortgage off.

It, therefore, stands to reason that she was right that her brother never told her about the $7000 note and mortgage, (R. 150) and that she never knew of the same until after the death of her mother, when she and Mr. Eagleson went to the court house to look at the records. (R. 150-a.) Why all this secrecy with his only sister concerning the affairs pertaining to their home property?

This mortgage still remains uncancelled of record, notwithstanding he received a deed for the premises in 1946. This would indicate he might be uncertain as to his rights under the deed, and did not want to lose the security of the mortgage made and filed in 1943.

The defendant was very uncertain as to when and how his sister learned of the deed given him by the mother for the property (R. 130, 131, 132). On the other hand his sister was certain it was in January, 1950, when she was in New York, at the time she gave him the tax bills and the $5500.00 check dated January 19, 1950. (R. 151, 152, 153, 154.) Again, the question arises why all the secrecy with his sister concerning the family home? In the light of all the circumstances, his excuse for withholding the deed from record for three years, becomes quite unsatisfactory and creates a strong suspicion that he did not want the sister to learn of the deed to the family home. It gives a strong impression of sharp dealing with the sister which does not appeal to the conscience of a Court of Equity.

Certainly the sister knew of no adverse claim by her brother under this deed until January, 1950, and she had no knowledge of the $7000.00 mortgage until after her mother's death.

The statute of limitations and laches, begin to run, if at all, at those times as far as the adverse claims of her brother to the home property were concerned.

The defendant identified Exhibits 128-134, certain checks of his as covering hospital expenses for his mother (R. 109, 110) but they show on their face that they cover hospital expenses of his mother's sister, Mrs. Olivia Amolch. These checks total $380.49. This mistake no doubt reflects the hasty and last minute changes of defense as shown by the answer filed during the trial.

Exhibits 114 and 115, two checks to Ohio National Bank for $500.00 each, should not be allowed without further proof, since he says they were for deposit in a joint checking account of his mother and himself. (R. 115, 134, 135). Also plaintiff's Exhibit B, a check to the defendant for $5500.00 from his mother under date of January 19, 1950, should be deducted from his alleged advances, in the light of the record, since he says he deposited this check in said joint checking account on the same day (R. 34), while the Court has since learned that on January 24, 1950, said $5500.00 check was deposited in the personal checking account of the defendant and no other deposits were ever made in said account which was closed April 30, 1951.

The defendant says (R. 126) that he paid off the mortgage and took it out to his mother, but Exhibit 179, the letter from the Savings Association shows that they mailed the canceled mortgage to his mother.

Exhibit 144, a check to Radiohio for $465.04, which defendant says was for a television he purchased for his mother, should not be allowed without further proof, since there is no showing she ordered it, and the Court cannot believe that the Vice President of the Columbia Broadcasting Company in charge of the television network, was looking to the home property for security when he purchased a television for his mother under date of November 28, 1950, in the light of his testimony that he called her religiously every day for five years at a certain hour of the day, regardless of where he was. (R. 128.)

Much is made of the sister's letter to the defendant, written near Thanksgiving in 1944, while they were both in New York, in which she refers to the mother trying to keep the property up for the defendant and she used the words "you paid for." His sister learned on her trip for the first time that he had paid the mortgage off which had required a payment of $35.00 monthly; she may have referred to that payment as a person inexperienced in such matters. In any event, the defendant could not have been misled by any such comment, since the

record as of Thanksgiving, 1944, showed he had not advanced his mother any money since the date of the $7000.00 mortgage of August 8, 1943, and there was no conceivable basis for him to consider at that time, that equitable or otherwise, he had paid for this home property that cost $15,000 twenty-three years before. The letter of the sister also stated she wanted the mother to sell out and "use her own money." She may have referred to the proceeds of the mother's share in the property, and again the defendant was in no way misled, and there is much reason to believe he knew full well that his sister had her own money in this property.

1. The Court finds that the plaintiff is the equitable owner of an undivided 2/5ths interest in said premises.

2. The Court finds that the indebtedness of the mother to the defendant consists of the $7000.00 mortgage of August 8, 1943, the $1000.00 cognovit note of July 26, 1945, and the sum of $7590.33 secured by the deed from his mother.

3. The Court finds that the deed from the mother is in the nature of an equitable mortgage.

4. The Court finds that the total indebtedness of the mother to defendant, due to advances, must be paid out of the other 3/5ths of said premises and the 2/5ths interest of the plaintiff is not liable for any of said sum, except the sum of $4415.81 used to pay off the mortgage to the Savings Association, to which said sum the defendant was subrogated; and that the said other 3/5ths interest must be exhausted, before the 2/5ths interest of the plaintiff may be used to pay said $4415.81 or any part thereof.

The Court is satisfied that said other 3/5ths interest will be far more than necessary to satisfy in full the total claims of the defendant, and that, therefore, the 2/5ths interest of the plaintiff will not be subject to the payment of any part of the $4415. 81 advanced to pay off the Savings Company mortgage.

As part of the history of the country, the Court must take judicial notice that lands leased years ago were leased at much less than their present value. **17 O. Jur. Evidence, Sec. 58, p. 78;** Ludlow v. Brenter, 3 C. C. 82; **Lanman v. Upper Arlington, 50 Abs 546; Common Knowledge, 17 O. Jur. Evidence, Sec. 16, p. 42. Leonard v. State, 100 Oh St 456.**

The Court, therefore, orders the defendant to convey to the plaintiff, legal title to an undivided 2/5ths interest in fee simple in the premises described in the petition; and in the event that said conveyance is not made within thirty days from the Entry of said decree herein, said decree itself shall act as said conveyance.

Entry accordingly with exceptions to defense counsel.